### MORRISON–KNUDSEN CO., Inc. v. UNITED STATES.

#### No. 46770.

United States Court of Claims.

June 6, 1949.

Herman J. Galloway, Washington, D. C. (King & King, Washington, D. C., on the brief), for plaintiff.

Grover C. Sherrod, Washington, D. C., and H. G. Morison, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and MADDEN, HOWELL, WHITAKER, and LITTLETON, Judges.

MADDEN, Judge.

The plaintiff made a contract with the Government to construct the Roza diversion dam, bench flume, and railroad bridge in the Roza Division of the Yakima Project of the Bureau of Reclamation, Department of the Interior. The work was near Yakima, Washington. Specifications for the work and invitations for bids were sent out on July 2, 1938. Bids were opened on August 5. The plaintiff was the low bidder, and being satisfied that it would be awarded the contract in due course, it started work on August 15 at its own risk of not ultimately getting the contract. On August 29 it was awarded the contract which was dated August 30. The contract was based on unit prices bid by the plaintiff, so much, e. g., for placing a cubic yard of concrete. The contract prices, applied to the Government's estimate of the number of units of work, gave an estimated cost of $526,860 for the performance of the contract.

The plaintiff was given notice to proceed on September 24, 1938. The contract provided that work should commence within 30 days after notice to proceed, and should be completed within 550 days thereafter. Thus the completion date was fixed at March 27, 1940. In fact, the work was accepted by the Government on December 28, 1939. On April 19, 1940, there was a settlement of the contract account, final payment was made to the plaintiff and it gave the Government a release in which, however, it reserved eight items of claim, which items constitute the subject of this suit. The suit alleges that in various ways the Government breached its contract with the plaintiff.

### Transmission Line

As shown in our Finding No. 9, the Government, in the contract, agreed that it owned or would acquire a certain electric power transmission line which led to a point near the project, and would permit the contractor to use the line without charge in performing the contract work. This provision had been written into the proposed contract when it was sent out with invitations for bids, and remained in the contract made with the plaintiff. It so happened that this power line had been built by the power company some two years before under an arrangement with the plaintiff, which was then performing another contract with the Government and needed power. As soon as the plaintiff started work on the contract here in litigation, it made an arrangement with the power company to extend the line from its former terminus to a point near the new work, and to install the necessary equipment to make the power available. This was done. The Government did not actually obtain a deed for the power line until August 1940. The plaintiff claims that the Government, by not acquiring title to the power line immediately, breached its contract to make the line available without

charge, to the plaintiff's damage. It claims some $1,800 as the rental value for the period, or some $1,900 as reimbursement of payments made by it to the power company for the use of the line. The plaintiff is not entitled to rent, since it did not own the line or any such interest in it as would form a basis for rent. Its former arrangement with the power company had been to reimburse the company for labor and depreciation when the line was dismantled, as it was then contemplated that it would be. In fact it was not dismantled, but was bought by the Government, and, so far as appears, the plaintiff was never called upon to reimburse the power company. As to the payments which the plaintiff says it made to the company, the evidence is not satisfactory, but it seems more probable that those payments were not for the use of the old line but for the extension and equipment of the new line, and hence were not covered by the Government's promise to acquire and make available the old line. The plaintiff has not proved that it was harmed by the Government's tardy acquisition of title to the old line, and cannot recover on this item.

### Compacted Fills

■ The provisions of the contract relating to this item are quoted in Finding No. 12. The plaintiff says that the Government breached its contract in requiring it to use for these fills material excavated on this job, although this material contained more than 25% of oversize rock which had to be picked out of the material and disposed of before the material could be properly compacted. The plaintiff points to paragraph 46(b) of the specifications which says that, "Insofar as practicable, suitable material satisfactory to the contracting officer, obtained from required excavations" shall be used, "but where sufficient suitable material is not available from this source additional materials shall be obtained from borrow pits designated by the contracting officer". It says it was not "practicable" within the meaning of the contract, to require the contractor to go to the expense of picking out the oversize rocks to make the excavated material usable for compacting. It says that the Government showed this

lack of consideration for the interests of the plaintiff in order to save itself the extra cost, 50 cents per cubic yard, which it would have had to pay if new material had been taken from a borrow pit and used in place of the material already excavated and paid for. We do not say that such a lack of consideration for the interests of the plaintiff might not constitute a breach of contract, but we find the same impediment to recovery here as in the item of the claim relating to the transmission line. The plaintiff has not shown that it was harmed by not being given the privilege. It has not shown that there was available any source of borrow material that could have been obtained at a cost less than the cost of picking out the oversize rock from the excavated material, considering, of course, the extra 50 cents per cubic yard which it would have received for taking material from the borrow pit. The area of the work, as described in our Finding No. 23, was a short, narrow oval-shaped valley. If there was within this area an available borrow location, the plaintiff has not given evidence of its existence or location. If it would have been necessary to go outside this valley for borrow, the cost of hauling, as shown in Finding No. 33 would have soon accounted for any saving otherwise made. The plaintiff not having proved that it was damaged, or, if damaged, how much, may not recover on this item of its claim.

### Rock Protection

■ The contract called for the placing of rock protection in the forms of dumped riprap, placed riprap, and dry rock paving. The provisions of the contract are set out in Finding No. 22. As to the dumped riprap, which constituted the great preponderance of the cubic yardage of rock protection, the contract required that a considerable proportion of the rocks should contain six or more cubic feet. When the rock for this work was blasted at the quarry site, it did not produce rocks of this size. A change order reducing the size to four cubic feet and reducing the unit price from $1.40 to $1.30 per cubic yard was offered to the plaintiff, which refused to accept the reduction in price. It placed the smaller rock, and was ultimately paid the original

contract price and made a profit on this part of the rock protection work.

As to the placed riprap and dry rock paving, it was found that the rock in the valley where the work was located would not break to the sizes specified in the contract, and it was ultimately necessary for the plaintiff to secure rock for the placed riprap from a quarry 6½ miles downstream from the project, and rock for the dry rock paving from a quarry 13½ miles upstream. The cost to the plaintiff was considerably more than the contract price, and, taking all three kinds of rock protection into account, the plaintiff's cost was $33,670.53 and it was paid $27,712.55, suffering a loss of $5,957.98.

As shown in Finding No. 22, paragraph 50 of the specifications provided that, "The rock used for rock protection shall be hard, dense, and durable and equivalent in this respect, in the opinion of the contracting officer, to the best rock for resisting wear or erosion that exists in the vicinity of the work." When the plaintiff bid on the contract, it reasonably assumed, from an examination of the locality, that suitable rock for the rock protection work was available in the vicinity of the work, i. e., in the area described in Finding No. 23, and depicted on Drawing 2 of the specifications, and labeled a "Vicinity Map". We think that this was the correct interpretation of the writing and drawing. As it turned out, the rock was not thus available, but had to be found at considerable distances and at greatly increased expense. The plaintiff requested an adjustment under Article 4 of the contract, quoted in Finding No. 7, which promised such an adjustment if unforeseen or latent conditions should be encountered and should increase the cost of the work. We think the plaintiff's request was well-founded. The contracting officer and, on appeal, the head of the department refused any adjustment, but did not find, as a fact, that unforeseen conditions had not been encountered, as the plaintiff claimed. They interpreted the contract erroneously, we think, to mean that the plaintiff had to find suitable rock, at whatever distance from the work, for the bid price. This interpretation is not consistent with the requirement of the specification that the rock placed should be equivalent in quality "to the best rock * * * that exists in the vicinity of the work." If the rock in the vicinity was suitable, they should have let the plaintiff use it. If it was not, an unforeseen condition was encountered to which Article 4 of the contract was applicable, or an additional requirement was imposed, to which Article 3 was applicable. In either case, the plaintiff was entitled to be compensated. We think that the administrative officers did not give fair and adequate consideration to the issues presented to them, and that the merits of the plaintiff's claim are open for our decision. We think the plaintiff is entitled to recover the difference between what it was paid for the placed riprap and dry rock paving, $2,771.45, and the cost of the work plus ten percent for profit, $11,072.11, amounting to $8,300.66.

### Bench Flume

█ The contract called for the construction of a so-called Bench Flume, which was a rectangular open trough of reinforced concrete 28 feet wide and some twelve feet deep. The contract did not specify whether, in its construction, the concrete should be poured monolithically, or the floor should be poured first and the sides formed and poured as a separate operation. The plaintiff had on other occasions built two concrete flumes pouring the bottom and side monolithically. One of these flumes was much smaller than the one here in dispute and the size of the other was not shown. There was discussion as to how the instant flume should be built, and the Government's concrete inspector handed the plaintiff's superintendent a cross-section sketch and a memorandum showing the construction of the bottom and sides of the flume as separate operations, and giving reasons why that was the preferable method of construction. The plaintiff then built the flume, using the nonmonolithic method suggested by the Government's concrete inspector. This method was the method in general use for such structures at the time. The cost of constructing the flume was $48,574. The price bid and received by the plaintiff was

$36,132.50. The plaintiff seeks to recover for its loss.

In Finding No. 41 we have set out the contract requirement as to protests to be made by the contractor if it considered any direction given it to be beyond the requirements of the contract. The plaintiff's superintendent did not regard the concrete inspector's memorandum as a direction, and did not make any protest. He testified that though he had not been directed to use the nonmonolithic method, he thought that if he did not use it, the concrete inspector's inspection would be so severe and meticulous that any advantage otherwise to be gained from the monolithic method would be destroyed, and that, therefore, he was coerced into using the method he used, to the plaintiff's damage. He gave no evidence of any reason for thinking he would be unfairly dealt with if he did what the contract permitted him to do, and did it well. We cannot allow his subjective impressions, not based upon any evidence, to displace the plain requirements of the contract. Any loss which may have resulted from the plaintiff's choice of method of construction of the bench flume cannot be recovered from the Government.

### Grout

■ The contract provided, as shown in Finding No. 45, that in placing concrete, recesses or open spaces should be left for the insertion of all fixed metalwork, and that after the metalwork was installed, the recesses should be filled with cement grout. Cement grout is a fluid mixture of cement, or cement and sand, and water. Its advantage is that it can be poured into a narrow space or through a narrow opening, and will flow and settle into all unoccupied spaces leaving no voids. It will pass into spaces or through openings that concrete containing gravel or crushed stone cannot get into or through. Its disadvantage, if the space to be filled is more than a narrow crack, is that, since it contains so much water, it shrinks more than concrete does when it dries, and thus leaves cracks which may permit weathering and damage to the structure.

There were four recesses to be filled on the project, one at each end of the two roller gates. The Government required the plaintiff to fill the recesses with various mixtures, some grout, some concrete with small gravel, and some concrete with large gravel, putting in relatively small amounts of each and then vibrating them together in an attempt to get the spaces filled. The process was difficult and time consuming, and it cost the plaintiff $3,182.62 to fill the four recesses with 81.184 cubic yards of the various mixtures. The plaintiff protested and requested a change order but received no reply to its request. In the consideration of the plaintiff's claim presented at the time of settlement neither the contracting officer nor the head of the department made findings of fact pertaining to the difference in method or cost of placing as between concrete and grout.

We have found that the nature of the work of placing the various mixtures in the recesses was more nearly comparable to the placing of concrete in the service bridge, than to any other work covered by the contract. The contract price for that work was $20 per cubic yard, which would make $1,623.60 for the 81.18 yards placed in the recesses. As a result of a payment and a later deduction described in Finding No. 51, the plaintiff was paid $211.72, for which the Government should receive credit. Since the filling of the recesses with grout was, so far as we can gather from the contract, to be done by the plaintiff without charge, and since the plaintiff has not proved what the cost of placing grout would have been, we credit the Government with $400, approximately $5.00 per yard, on that account. The plaintiff may recover $1,011.88 on this item of its claim.

### Roller Gates

■ The contract required the plaintiff to place, in the concrete structure to be built, two cylindrical steel roller gates, each 14 feet in diameter and 110 feet long, to be furnished by the Government. Paragraph 76 of the specifications, quoted in Finding No. 55, says, "It is contemplated that the roller gates will not be delivered to the contractor until two hundred fifty days after receipt of notice to proceed."

In the consideration of its bid for the contract, in July and early August, 1938,

the plaintiff estimated that, the bids being opened on August 5, the contract would be awarded and notice to proceed given in August. The time for completion, 550 days, would then expire in February or early March, 1940, which, the plaintiff knew, would mean that the last several months of the contract time would be too cold for most of the contract work. It knew, therefore, that practically all of the contract work would have to be completed before the cold weather of the latter months of 1939. Applying the language of the specification to these physical facts, the plaintiffs interpreted the language relating to the time of delivery of the roller gates as meaning that the gates would be delivered within 250 days after notice to proceed, which would mean in April or May 1939. In Findings No. 56–60 we show the facts bearing on the interpretation of the language of the specification relating to the delivery of the roller gates. We conclude that the plaintiff's interpretation was correct. If the statement that the gates would not be delivered until 250 days after receipt of notice to proceed did not mean that they would be delivered at that time, the contract contained no promise whatever on the part of the Government as to when an essential part of what was to be installed under the contract would be available. The statement was made in an invitation for competitive bids on a contract. No rational contractor would have made a bid for the work of placing materials to be furnished by the Government, with no promise by the Government to furnish materials needed, halfway along in the performance of the contract, to permit the work to proceed.

The notice to proceed was not, in fact, received until September 24, 1938, which made the date of delivery of the roller gates June 1, 1939. In fact the parts of the gates necessary for their orderly assembly were not received until, as to one of them, August 15, and the other, August 22, 1939. There was further delay, attributable to the company which manufactured the gates for the Government, in fitting the rims. Their assembly was completed on September 22, 1939, and their sand blasting and painting began the next day.

Finding No. 61 shows the conduct of the Government with regard to securing the roller gates. When the plaintiff was given notice to proceed on September 24, 1938, drawings and specifications upon which to invite bids on the roller gates were not ready. The invitation for bids did not go out until October 31. Changes were made in the specifications, so that the bids were not opened until December 5, and the contract was not let until December 23. We think that these and the other facts recited in our finding show a lack of consideration for the legitimate interests of the plaintiff, in proceeding so slowly and haltingly with getting the manufacture of these essential materials under way. We think that the Government's action made inevitable a late delivery of the gates, which as could have been foreseen, would delay and damage the plaintiff. The Government breached its contract by its late delivery of the gates. If the gates had been delivered on time, the plaintiff could have completed its contract work by the end of September, 1939. We consider the plaintiff's damages from this breach under separate items.

## Assembly of Gates

Because the parts of the roller gates were delivered out of order, more work was required in placing the rim and rack installations at each end than would have been required if they had been completed at the factory, and shipped as a unit, as the plaintiff's contract provided. This extra work cost the plaintiff $1,390.08, which with ten per cent added, amounts to $1,528.-96, which amount the plaintiff may recover.

## Painting Gates

The specifications required that paint should not be applied to the gates when the temperature of the metal was less than 60°, or the temperature of the air less than 50°. As we have said, painting of the gates began on September 30, 1939. It proceeded to about November 30, when the plaintiff, at its request, was relieved of completing the painting. Because of the cool weather of October and November, the work had to be done intermittently, heat had to be applied to the metal at consider-

able cost, and time had to be spent in warming and mixing paint. When the plaintiff was excused from completing the painting job, the Government deducted $563.20 more than it would have cost the plaintiff to complete the job if it could have done it in warm weather. As shown in Finding No. 78, the plaintiff's losses resulting from the painting being thrown into cold weather were $2,672.56 and the plaintiff may recover this amount.

## Tunnel

If the roller gates had been delivered by June 1, 1939, they could have been installed and used to divert the river while other work below the dam was completed. The gates not being available, the plaintiff was obliged to build a temporary tunnel in the east overflow section of the dam, and, after it had served its purpose, stop it up with concrete. Finding No. 80 shows that the extra costs in connection with the tunnel were $8,679.18 which, with ten percent added, amount to $9,547.09. This amount the plaintiff may recover.

## Delay

The Government accepted the contract work on December 28, 1939. The plaintiff had removed its equipment from the job and terminated its straight-time personnel on December 23. As shown in Finding 82, plaintiff could have completed its work 90 days earlier than it did, and could have removed its equipment and terminated its straight-time personnel that much earlier. Plaintiff is entitled to compensation for office overhead for the 90 days in the amount of $4,793.40, and for payroll of straight-time employees for that time in the amount of $5,201.10. The fair and reasonable rental value of the equipment maintained by plaintiff was $267.92 per day, making a total of $24,112.80 for the 90 days. However, we allow plaintiff only one half of the fair rental value of such equipment because the equipment was not in use and was not suffering the wear and tear of use during a period equal to that of the delay in winding up the job. Full rental value should not be awarded for such delay. Brand Investment Co. v. United States, 58 F.Supp. 749, 102 Ct.Cl. 40. Accordingly, plaintiff may recover for the three items the sum of $22,050.90.

The sum of all the items of recovery shown above is $45,112.05 and the plaintiff may have judgment for this amount.

It is so ordered.

HOWELL, WHITAKER, and LITTLETON, Judges; and JONES, Chief Judge, concur.