**L. L. HALL CONSTRUCTION COMPANY**

v.

**The UNITED STATES.**

**No. 269–61.**

United States Court of Claims.

Dec. 16, 1966.

C. Robert Mathis, Washington, D. C., attorney of record, for plaintiff. James P. Parker, Davies, Richberg, Tydings, Landa & Duff, Washington, D. C., of counsel.

Frances L. Nunn, Washington, D. C., with whom was Asst. Atty. Gen. Barefoot Sanders, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

## OPINION

PER CURIAM.

This case was referred to Chief Trial Commissioner Marion T. Bennett with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in an opinion and report filed on September 20, 1966. On October 17, 1966, the parties filed a joint motion that the court adopt and publish in its entirety as the opinion and findings of the court the opinion and findings of the commissioner. Since the court is in agreement with the opinion, findings and recommendation of the commissioner, it hereby adopts the same as the basis for its judgment in this case, as hereinafter set forth. Plaintiff is, therefore, entitled to recover from defendant the sum of $18,004.51 and judgment is entered for plaintiff in that amount.

## OPINION OF COMMISSIONER *

BENNETT, Chief Commissioner.

This action for breach of contract arises out of an agreement between plaintiff and the defendant, the latter acting through the Department of the Navy, Bureau of Yards and Docks, for the repair, restabilization of runway overruns, and the improvement of crash strips at the U. S. Naval Air Station, Cecil Field, Florida, at a total cost of $186,417.74. This contract contained the standard general provisions in Government construction contracts for changes, changed conditions, termination, and disputes, but there was no suspension-of-work clause.

In general, plaintiff sues because of the failure of defendant to make available the necessary runways for timely

---

* The opinion, findings of fact, and recommended conclusion of law are submitted under the order of reference and Rule 57 (a).

completion of plaintiff's work. The reason given by defendant for delay was that the remaining runways were required for military operations, since those plaintiff had worked on were still being repaired by other contractors at the site. Plaintiff's equipment was thereby idled, eventually removed from the site, and used on other jobs. It was returned some 3 months later for completion of this contract. This and other delays, aggregating about 5 months, caused additional expense to plaintiff, not contemplated at the time of the original contract, and was contrary to the terms and intent of the contract. After a trial de novo, it is concluded upon the law and the facts that plaintiff is entitled to recover delay-damages, although not to the extent claimed. The facts are set forth in the findings and will be summarized here.

## I

Cecil Field consists of two pairs of parallel runways, two running north and south and two running east and west. Navy regulations at this installation require that at least one runway in each direction be available for military use at all times.

This contract (No. NBy–19936, Spec. 19936/58) was entered into by the parties on June 30, 1959, and provided that work should commence on July 5, 1959, and should be completed 60 days thereafter on September 3, 1959. Defendant held a preconstruction conference on July 2, 1959, to advise plaintiff of various aspects of the contract, including the fact that other contractors would be performing work simultaneously with plaintiff on these runways. At that time defendant did not contemplate, and plaintiff did not anticipate, any lengthy shutdown of the type later encountered by plaintiff.

Plaintiff began work on July 6, 1959, and proceeded diligently until about 50 percent of the work was completed in late July 1959. On or about July 29, 1959, plaintiff requested that defendant make the adjacent runways available so that plaintiff could complete its work. Plaintiff was denied access to such runways until the other contractors at the site had completed work on runways where plaintiff had already finished. This was because it was necessary to maintain flight operations. However, defendant estimated such access could be given on or about Sptember 15, 1959. Further efforts failed to obtain the additional runways in August, and plaintiff proceeded at a greatly reduced tempo, idling its equipment where necessary and removing it to other jobs where possible. Plaintiff was not permitted to continue operations about September 15 as anticipated, so by the end of September all plaintiff's equipment had been removed from the jobsite.

Toward the latter part of November 1959, it became clear to plaintiff's representative at Cecil Field, through his contacts with defendant, that plaintiff would be allowed to continue work in the near future, and plaintiff began remobilizing during late November and early December. On December 2, 1959, defendant advised plaintiff it could commence work on December 7, 1959, on one runway, that on December 14 another would be available, and that by about December 21 the last runway would also be available. Plaintiff was allowed to commence work on December 8, one day after it expected to do so, and when it requested that it be allowed to continue work on the last runway on December 21 as expected, and as defendant had previously advised, plaintiff was denied access to this runway until January 14, 1960. Plaintiff satisfactorily completed the contract on February 2, 1960, and was granted extensions of time through and including this date (152 days) at no change in the contract price. The contracting officer found that the delays were beyond the control and without fault or negligence on plaintiff's part. Liquidated damages assessed were refunded.

Plaintiff submitted its claim for equitable adjustment under the contract to the resident officer in charge of con-

struction and the base commanding officer on May 27, 1960, and thereafter to the contracting officer through the officer in charge of construction. Plaintiff was denied recovery on the grounds that its claim was for additional costs due to delays—a claim for damages for breach and not for additional work performed, and thus could not be the subject of compensation under the contract. Plaintiff appealed to the Armed Services Board of Contract Appeals which affirmed that the board was without authority to adjust the contract price to compensate for damages due to a delay. The board dismissed plaintiff's claim on defendant's motion. Thereupon, plaintiff filed timely suit in this court. The claim is properly in this court because it could not be resolved administratively under the contract provisions for adjustment of disputes. United States v. Anthony Grace & Sons, 384 U.S. 424, 86 S.Ct. 1539, 16 L.Ed.2d 662 (1966); United States v. Utah Constr. & Mining Co., 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966). The only relevant finding of fact made administratively was that plaintiff was not to blame for the delay, and that finding is adopted here.

II

Defendant has admitted all along that there is no issue as to any fault or negligence on the part of plaintiff for the delays encountered. The issue respecting liability is whether or not the delays forced on plaintiff by defendant's failure to give access to working areas were excusable under the terms and language of the contract. Defendant contends that they were and that defendant gave notice of the possibility of delays by reserving the right to make changes. Plaintiff maintains that such delays as encountered were not excusable under the terms of the contract and were not contemplated by it. Further, plaintiff says the delays were grossly unreasonable and due to negligence and lack of due diligence on the part of defendant. Plaintiff relies principally on George A. Fuller Co. v. United States, 69 F.Supp. 409, 108 Ct.Cl. 70 (1947), and the cases cited therein, and upon Peter Kiewit Sons' Co. v. United States, 151 F.Supp. 726, 138 Ct.Cl. 668 (1957); Chalender v. United States, 119 F.Supp. 186, 127 Ct. Cl. 557 (1954); and Kehm Corp. v. United States, 93 F.Supp. 620, 119 Ct.Cl. 454 (1950).

Defendant contends no evidence was offered that the delays were the fault of defendant and further states that Government representatives were diligent in efforts to speed up work of the other contractors at the site. It relies primarily on the doctrines announced by the Supreme Court in United States v. Howard P. Foley Co., 329 U.S. 64, 67 S.Ct. 154, 91 L.Ed. 44 (1946), reversing 63 F.Supp. 209, 105 Ct.Cl. 161 (1945), United States v. Rice, 317 U.S. 61, 63 S.Ct. 120, 87 L.Ed. 53 (1942), reversing 95 Ct.Cl. 84 (1941), and H. E. Crook Co. v. United States, 270 U.S. 4, 46 S.Ct. 184, 70 L.Ed. 438 (1926). Defendant places further reliance on specification 1.23 of the contract which it states indicates that possible additional delays and interruptions might occur in this contract. The specification reads as follows:

1.23 *Scheduling of Work.*—The contractor shall schedule all work so as to minimize any interruptions to flight operations. The government will make every effort to schedule aircraft operations to permit accomplishment of the contractors daily schedule. However, in the event of emergencies, intense operational demands, adverse wind conditions, etc., the contractor will be required to move his operations to a different location in the interest of safety to personnel and flight.

The above-quoted specification which states that the contractor might, in emergencies, "be required to move his operations to a different location in the interest of safety to personnel and flight," refers only to a temporary delay or interruption and in no way covered the approximate 4-month shutdown from August to December encountered in this case. The delays encountered by plaintiff, and as claimed herein, are not of

the type listed in the above specification but are of a different nature entirely. As to the contention that plaintiff was on notice of possible delays because the changes article of the contract reserved in defendant the right to make changes that might entail delay, the short answer is that no changes such as provided for in this changes article were made in plaintiff's contract and no delay ensued therefrom.[1] With regard to the other contract terms, it is clear from the cases cited by the parties and the numerous other decisions of this court, that where the Government unreasonably hinders or delays a contractor's performance, even though it does not prevent the eventual completion of the contract, it has breached its implied obligation not to delay the contract, in the absence of a clause expressly exempting it from such liability. Further, it is clear from the United States v. Howard P. Foley Co. and George A. Fuller Co. v. United States cases, supra, and others cited, that defendant is not liable for delays which it did not cause, over which it had no control, or delays encountered by a contractor notwithstanding defendant's diligence in performance of its responsibilities under the contract. Thus, the questions on which liability turns in this case are whether defendant was the cause of the delays here, whether it failed to use reasonable diligence and good faith in performance of its responsibilities under this contract, and whether the contract contemplated and excused the delays. Commerce Int'l Co. v. United States, 338

F.2d 81, 85, 167 Ct.Cl. 529, 535–536 (1964).

Defendant ordered plaintiff to commence work on July 5 and to finish by September 3, 1959, 60 days later. Plaintiff efficiently conducted its work so as to meet these requirements, but when about half the contract was completed, defendant failed to allow plaintiff to continue at new work areas because of the delays in work performed by other contractors at Cecil Field. The evidence reveals that these other contractors were substantially behind schedule and proceeding slowly. An internal memorandum of August 16, 1960, in evidence, reveals that defendant chose to allow these contractors to proceed rather than allow plaintiff to do so, on the basis that it considered these two other contracts to be more critical. Thus, plaintiff, whose operations were efficient and expeditious, was penalized in favor of the two seemingly inefficient contractors, in the alleged best interest of the Government. Further, the evidence discloses that one of the contracts, originally scheduled for completion on July 1, 1959, before plaintiff was scheduled to start work, was still being delayed as of October 5, 1959, because of failure to receive Government-furnished material. Defendant gave plaintiff other dates by which it could expect to resume work but these too proved illusory as heretofore shown.

Defendant has identified no contract provision and presented no evidence whatever to justify its shutdown of plaintiff's efficient operations in favor of

---

1. 3. CHANGES

The Contracting Officer may at any time, by a written order, and without notice to the sureties, make changes in the drawings and/or specifications of this contract and within the general scope thereof. If such changes cause an increase or decrease in the amount due under this contract, or in the time required for its performance, an equitable adjustment shall be made and the contract shall be modified in writing accordingly. Any claim of the Contractor for adjustment under this clause must be asserted in writing within 30 days from the date of receipt by the Contractor of the notifica-

tion of change: *Provided, however,* That the Contracting Officer, if he determines that the facts justify such action, may receive and consider, and adjust any such claim asserted at any time prior to the date of final settlement of the contract. If the parties fail to agree upon the adjustment to be made the dispute shall be determined as provided in Clause 6 hereof. But nothing provided in this clause shall excuse the Contractor from proceeding with the prosecution of the work as changed. Except as otherwise herein provided, no charge for any extra work or material will be allowed.

**564**

two other contracts which were slow-moving, nor did it give any excuse for failure to supply the material on one of these other contracts delaying plaintiff's operations. It was incumbent upon defendant to supply such evidence of excusable delay else it must be assumed that there is no justification or excuse for its action. Since such evidence is lacking, it must be assumed that there is none, that defendant is at fault, and it is so found herein. Fuller, supra, 69 F.Supp. 409, 108 Ct.Cl. at 101; Brand Inv. Co. v. United States, 58 F.Supp. 749, 751, 102 Ct.Cl. 40, 44 (1944), cert. denied, 324 U.S. 850, 65 S.Ct. 684, 89 L.Ed. 1410 (1945).

■ In Peter Kiewit Sons' Co. v. United States, supra, 151 F.Supp. 726, 138 Ct.Cl. at 675, this court determined that the Government may not, with impunity, do whatever is in its own best interests regardless of the harm which may be done to its contractor. In that case, as with the instant case, there was another contractor at the site who was having difficulties meeting its schedule, yet a proceed order was issued to Peter Kiewit. Defendant gave the inefficient contractor priority in delivery over the contract on which the efficient contractor depended. This court found the Government breached its implied obligation not to delay the blameless contractor. It is plain that the Government is obligated to prevent interference with orderly and reasonable progress of a contractor's work by other contractors over whom the Government has control. That is the situation here. Nor will affirmative wrongful action or failure of the defendant to discharge its obligations under the contract be cured simply by waiving liquidated damages. Rogers v. United States, 99 Ct.Cl. 393, 411 (1943).

■ The failure of defendant to furnish any reason or justification for unreasonable and uncontemplated delay in supplying Government-furnished material on another contract, the completion of which was deemed necessary before defendant allowed plaintiff to continue its work, would be sufficient reason of itself to hold that the defendant was at fault and is liable for plaintiff's additional expenses of delay herein. This court has long held that in the absence of a clause in the contract specifically exempting it from such liability the Government is liable for such delays where it furnished no excusable reason. As the court said in *Fuller*, supra, 69 F.Supp. at 412, 108 Ct.Cl. at 96, "[t]he decisions of this court so holding are too numerous to list them all", but many cases are collected there and are here adopted by reference. See also Chalender v. United States and Kehm Corp. v. United States, supra.

The cases relied on by defendant are distinguishable because therein defendant either performed with diligence or was not to blame for delay unreasonable in character or beyond contemplation of the contract and parties. Here defendant caused the delay; it was unreasonable under the circumstances; defendant was not shown to have used reasonable diligence and good faith in avoiding or mitigating it; the contract did not contemplate such delay or excuse it; defendant breached an implied warranty that the site would be available to plaintiff within the contract period; and there was no provision in the contract for relief to plaintiff faced with such a breach. This is a clear-cut, delay-damages, breach-of-contract case and, as such, is properly before the court for resolution. United States v. Utah Constr. & Mining Co., supra. Plaintiff is entitled to recover delay-damages for the unreasonable delays it suffered due to defendant's faults which have not been shown as excusable under the contract.

## III

The parties disagree as to the amount of damages, if any, applicable to the delays. At issue is the method of computing plaintiff's additional equipment costs resulting from the delays. The parties agree that actual equipment costs cannot be extracted from plaintiff's books and records with reasonable accuracy for the period of delay. They are in agreement that all equipment involved in this claim

was owned by plaintiff and none was rented.

Plaintiff computed its additional equipment costs on the basis of equipment rental rates disclosed in the 1958 edition of the Associated Equipment Distributors Manual, generally known as A.E.D. rates, because in plaintiff's opinion these rates, which are national averages, represent a fair and reasonable approximation of plaintiff's costs, were previously accepted by this court in the case of Carlo Bianchi & Co. v. United States, 157 Ct.Cl. 432 (1962), rev'd on other grounds, 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963), and defendant was on notice that plaintiff intended to rely on such rates and did not object. Plaintiff here applied 50 percent of these rates for idle time (because the equipment suffers no wear and tear when idle) and deducted 15 percent to eliminate the element of profit.

Defendant opposes the use of the A.E.D. rates by plaintiff. It submits that in the absence of actual costs obtained from plaintiff's books and records, the best criterion for determining a contractor's cost for owning its own equipment would be the equipment ownership rates published by the Associated General Contractors of America, Inc., generally known as A.G.C. rates, on the basis that these rates permit a determination of a contractor's ownership cost based on a percentage of the contractor's own capital investment for each piece of equipment.[2] Plaintiff's actual acquisition cost for each piece of equipment was readily available from its books and records, and is in evidence here.

Defendant contends that, since this manual computes the ownership cost on an operating basis, only 50 percent of operating costs should be applied in computing idle equipment costs, as was done in the case of Winston Bros. Co. v. United States, 130 F.Supp. 374, 131 Ct. Cl. 245 (1955).

It is true, as plaintiff says, that the Court of Claims allowed A.E.D. rental rates for contractor-owned equipment, less a 15-percent profit factor, as the measure of damages in Bianchi, supra, rev'd on other grounds, 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963). The findings and opinion in that case do not indicate there was any challenge by defendant to such rates as a reasonable measure of damages and, perhaps for that reason, they were applied without discussion or explanation as to their propriety. Reference to the transcript in that case shows, at pages 1845 and 1846, that plaintiff had actually for many years either hired equipment for its own use, or rented out to others, equipment it owned and, further, that plaintiff paid A.E.D. rentals during the period in issue.

In Brand Inv. Co. v. United States, supra, 58 F.Supp. 749, 102 Ct.Cl. at 45, the court in a delays-damages case arising from breach of contract, absent any better proof, allowed 50 percent of the rental value of machines and equipment plaintiff had on the job which were made idle during the period of delay due to defendant's fault. This was described as a "jury verdict." There was no proof of any practice by plaintiff in renting machinery or equipment and the opinion and findings do not reveal the source

---

2. The contractors' annual equipment expense as shown by the A.G.C. Contractors' Equipment Ownership Expense Manual 1959, is composed of six items, as follows: (1) Depreciation, (2) Major Repairs and Overhauling, (3) Interest on the Investment, (4) Storage, Incidentals and Equipment Overhead, (5) Insurance, and (6) Taxes. These six items are expressed as percentages of the capital investment.

The manual states: " * * * Each contractor must use the value of his own particular piece of equipment, and by ap-

plying the recommended percentage per month (adjusted if necessary) against that figure the ownership cost can be determined." [Plaintiff's exhibit 47, p. 1.]

"It has been set forth herein that the purpose of this schedule is to reflect the average expense to a contractor owning and operating his own equipment on his own contracts. The charges which a contractor is justified in making under such circumstances are to be distinguished from those charges which are justifiable where the contractor may lease or rent a machine to others." [Id., p. 3]

of the rental rates used. The reduction of the rental rates by one-half was explained by the fact that if rented the machinery would not have suffered wear and tear while idle.

■ Brand Inv. Co., supra, explicitly overruled Phoenix Bridge Co. v. United States, 85 Ct.Cl. 603, 631 (1937). In the latter case, plaintiff claimed rental rates as the measure of its damages for equipment rendered idle by defendant-caused delays. The court there denied application of such rates and denied any recovery for idle equipment on the grounds that plaintiff had not shown that actual damages approximated the rates claimed or that plaintiff was put to any extra expense for the rental of equipment on other projects because of the delays. Further, the evidence failed to show that plaintiff was engaged, during the delay period, in other work where its equipment could have been used. As in *Brand Inv. Co.* the source of the rental rates proposed to be used is not disclosed. The *Phoenix Bridge Co.* decision perhaps did run contrary to the now well-established rule that although the proof may not be so positive as to enable the court to make an absolute determination of the precise excess costs resulting from delays chargeable to one party, an approximate and reasonable determination may be made on the basis of the facts and circumstances and the best available evidence,[3] in such amount as, in the judgment of fair men, resulted from the breach. Dale Constr. Co. v. United States, 168 Ct.Cl. 692, 729 (1964).

The court reaffirmed application of rental rates, less 50 percent, for contractor-owned equipment rendered idle in Henry Ericsson Co. v. United States, 62 F.Supp. 312, 104 Ct.Cl. 397 (1945), cert. denied, 327 U.S. 784, 66 S.Ct. 701, 90 L.Ed. 1011 (1946), citing *Brand Inv. Co.* as authority. See, to the same effect, Laburnum Constr. Corp. v. United States, 325 F.2d 451, 163 Ct.Cl. 339 (1963); Warren Bros. Roads Co. v. United States, 105 F.Supp. 826, 123 Ct.Cl. 48,

83 (1952), where rental rates of the Office of Price Administration were used; and Morrison-Knudsen Co. v. United States, 84 F.Supp. 282, 113 Ct.Cl. 536 (1949). Each case since *Brand* has cited it as basic authority. The principle seems well ingrained in precedent. However, examination of the foregoing cases reveals very little that is helpful in understanding why rental rates were applied there to contractor-owned equipment or that they were contested, as in the instant case, with A.G.C. rates. They have presumably been applied without contest and as the best formula available in the circumstances to approximate actual equipment costs which were not available. That is also about the most that can be said of court approval of A.G.C. rates. See, for example, Ben C. Gerwick, Inc. v. United States, 285 F.2d 432, 152 Ct.Cl. 69 (1961), a delay-damages case wherein A.G.C. rates, less 50 percent for idle time, applied to acquisition cost, or to appraised acquisition cost, were used to measure damages or additional ownership expense as a result of delay.

Defendant's reliance on Winston Bros. Co. v. United States, supra, does not throw much light on the problem because that was a congressional reference case, no judgment could be entered, and Congress was advised that plaintiffs had no legal or equitable right to recover. A.G.C. rates were, however, used to demonstrate plaintiffs' damages or losses on idle equipment. As in *Gerwick,* this was done by applying the percentages of ownership and operating expense contained in the A.G.C. manual of equipment ownership expense to plaintiffs' original capital investment or acquisition cost of equipment idled. There was no rental market for the equipment and no other work on which it could be used during the slowdown. It is interesting to note, in passing, that the same judge who thus spoke for the court in *Winston* did so in *Brand, Ericsson* and *Morrison-Knudsen* where rental rates were used. Clearly, the court has not yet definitively passed on the problem now in issue and has

---

3. George A. Fuller Co. v. United States, supra; Chalender v. United States, supra.

made no hard and fast choice that one or the other of the rates now proposed must be used to exclusion of the other. In approving rental rates, *Brand* did not discuss or reject A.G.C. rates in overruling *Phoenix Bridge Co.,* supra. By the same token, the dissenting judge in *Brand,* who wrote the opinion for a unanimous court in *Phoenix Bridge* rejecting rental rates for reasons stated above in the discussion of that case, said in his dissent that rental rates would be proper as a yardstick of damages where the fairness and reasonableness of the rental value is established by proper evidence and is not speculative, conjectural, and uncertain. Further, rental rates would be applicable if it could be shown (1) that had the equipment not been tied up due to delay by the Government, it could and would have been rented to others, or (2) that plaintiff had other work on which it could have used the equipment at a date earlier than it was able to use it because of the Government's delay. Finally, it is not enough to show that equipment has a rental value. That does not establish a loss such as a rental market could. The dissent in *Brand* collects the cases up to that date and shows that rental rates are applicable and have been widely used, and widely disregarded, depending upon how well they measure the lost useful value of idle equipment in a particular situation, with a minimum of speculation.

There is a special problem in the instant case in that plaintiff from the very beginning of the delay elected not to establish its costs for equipment during idle time but to rely on A.E.D. rental rates and so advised defendant which did not protest at that time. This poses the same problem as had it elected to rely on A.G.C. rates without showing actual costs. Can a contractor properly do so? Might not such an election result in higher damages? Is not the best evidence the actual costs? After all, these rate manuals are only guides and estimates based on national averages and subject to many adjustments. Where they are in evidence, and actual costs are not, they are only a tool with which to hammer out a reasonable "jury verdict."

Contractors generally do not keep books to prove damage claims. A large contractor sometimes does so when faced with delays caused by the Government, and where this is done those records are the best evidence. It is not always practicable for a small contractor to maintain actual book records of equipment costs. Even the defendant admits in its brief that such costs are rarely kept by small contractors. The expense and difficulty of doing so on a small job, such as the 60-day contract here, are obvious. Perhaps that explains defendant's initial acquiescence when plaintiff told defendant that it would not keep a record of costs. Of course, if every contractor could ignore actual equipment operating costs, assuming it had or could reasonably maintain records of such costs, and rely instead on A.E.D. or A.G.C. rates, it would be absurd. Some showing must be made that secondary evidence is appropriate because the primary evidence (actual costs) is nonexistent or unavailable for good reason.[4] It is believed that plaintiff meets that test here, and the problem thus boils down to a determination of which set of rates will least distort probable actual costs and most nearly reflect them. The objective is to place the contractor in as near the same financial position as he would have been had the breach complained of not occurred.

 Plaintiff was not in the business of leasing its equipment to others, nor does its claim include any equipment actually rented from outside sources for its own use. Whatever reason there may have been for the use of A.E.D. or other rental rates in previous cases, e. g., proof

---

4. In Perini Corp. v. United States (Ct.Cl. No. 228–58, Commissioner Gamer's report, November 30, 1965) footnote 11, finding 108, rejects plaintiffs' estimated costs based on A.G.C. rates where it claimed its books were deficient in showing actual costs. It was found plaintiffs' books were adequate and were the best evidence and plaintiffs could not disavow them for purposes of their claim.

of lost rental, agreement between the parties, a provision in the contract, or some other reason not pertinent to the case in suit, there is no justification for use of rental rates as a substitute for unavailable actual equipment-use costs in the instant case. The A.E.D. manual was not designed for any such purpose. It shows on its face that it was compiled for the information of equipment distributors and those who lease equipment. Its use under the facts of the instant case would grossly distort and inflate plaintiff's losses. On some items of equipment which were fully depreciated, the yearly A.E.D. rental rate is more than 900 percent of plaintiff's acquisition cost. On other items with many remaining months of life, the yearly A.E.D. rate is as high as 296.6 percent of such cost. On three-fourths of plaintiff's equipment, rental rates would enable it to recapture original cost in short order regardless of whether the equipment was already fully depreciated or had many months of remaining life. Even after a discount of 50 percent for idle time and 15 percent for profit as proposed by plaintiff, such rates clearly do not in any way fairly reflect the normal cost of maintaining contractor-owned idle equipment or satisfy the purpose of awarding damages in a contract case, i. e., to put plaintiff in the same financial position as if the breach had not occurred.

 The fair and reasonable measure of damages for plaintiff's equipment expenses in this case, for contractor-owned equipment, lacking actual cost records for the delay period, is the acquisition cost of each piece of equipment in-

volved applied to the formula set forth in the A.G.C. ownership expense manual and reduced by 50 percent for idle time, during which time the equipment suffers no wear and tear. Such a procedure especially makes sense here because the amount of idle time is clearly established and shown to be defendant's fault, and the projection using A.G.C. rates is based on plaintiff's proven costs of capital investment in equipment.[5] A reduction of the applicable rates by 50 percent for idle time has heretofore met the approval of the court, as noted above.

 Plaintiff's claim erroneously includes full rental (not reduced one-half for idle time) for all days its equipment was on the job more than 60 days. Plaintiff did not perform any additional work under the contract and thus any claim for full operational time on the part of the equipment is erroneous. All time properly claimed should be for idle time. While it was plaintiff's original intention to complete this job in 60 days, there were reasons other than delays sued for herein which would have extended plaintiff's work beyond 60 days. Two such reasons revealed by the evidence were (1) plaintiff's failure to remobilize as completely in December as in the previous summer since it was not allowed access to all areas even then, and (2) the additional work of supplying and dumping limerock in place, which plaintiff had originally subcontracted, but when its subcontractor refused to continue in December, plaintiff was required to do this additional work itself. The evidence shows it had substantial diffi-

5. The foregoing appears in harmony with the Armed Services Procurement Regulations (ASPR 15–402.1(c)), 3 CCH Gov't Cont.Rep. ¶ 34,969. See also extensive discussion where replacement cost and A.E.D. rental rates were rejected in favor of acquisition cost and A.G.C. rates less 50 percent for idle time of contractor-owned equipment. J. D. Shotwell Co., ASBCA 8961, 65–2 BCA ¶ 5243 (1965). This is the accepted view of the administrative boards in computing equitable adjustments for standby costs. David L. Brewer, ASBCA 9633, 65–1 BCA ¶ 4591

(1964); Blake Constr. Co., GSBCA 1176, 66–1 BCA ¶ 5589 (1966); 3 McBride & Wachtel, Government Contracts § 24.-670 [4].

Application of A.G.C. rates to cost of acquisition of equipment is generous to plaintiff in the instant case as illustrated, among other things, by the fact that 7 of plaintiff's 20 known pieces of equipment were fully depreciated and thereon plaintiff suffered no depreciation during idle time, yet the A.G.C. rates as set forth in the A.G.C. manual in evidence allows substantial percentages therefor.

culty in getting sufficient limerock to the site.

Another area of dispute is the proper general and administrative (G & A) expenses to allow on this claim. Plaintiff's method was erroneous, as described in findings 39 through 41. Defendant allowed nothing for G & A expenses, apparently on the basis that plaintiff's method was erroneous. There can be little doubt that plaintiff suffered certain additional G & A expenses in connection with these delays. Defendant supplied sufficient evidence, and its auditor, in fact, testified to a proper method of computing this additional expense. This proper method was the relation of total G & A expenses to all other expenses for the full fiscal year in which this contract ran, applied to the additional expenses as found herein to be attributable to defendant's delays. This method is used in the computation of plaintiff's just and proper damages in this case.

 Plaintiff claims, additionally, $4,003.47 as expenses of presenting this claim to the Armed Services Board of Contract Appeals. This amount was composed of attorneys' fees of $2,000, the salary of plaintiff's president of $1,250, with the balance being composed of the salaries of two other employees and certain traveling expenses. Plaintiff failed to produce any bill or check or other record supporting payment of $2,000 in attorneys' fees for the alleged services. Plaintiff produced no evidence other than self-supporting oral testimony for these alleged expenses, although it is stipulated that plaintiff's president and other employees were paid salaries exceeding the amounts claimed during this period. Therefore, this portion of plaintiff's case must fall for lack of adequate proof to relate the same to the pending claim. Further, legal, accounting, and secretarial expenses, and other costs not connected with the performance of the contract are not compensable as a part of damages for breach of contract. Rash v. United States, 360 F.2d 940, 947, 175

Ct.Cl. 797, 810 (May 1966); Dale Constr. Co. v. United States, 161 Ct.Cl. 825, 831 (1963). Plaintiff is entitled to damages of $18,004.51 as detailed in finding 43.