**J.R. YOUNGDALE CONSTRUCTION COMPANY, INC. Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 207–89C.**

United States Claims Court.

July 16, 1991.

Larry E. Robinson, Los Angeles, Cal., for plaintiff.

Martha H. DeGraff, Washington, D.C., with whom were David M. Cohen, Director, Commercial Litigation Branch, and Stuart M. Gerson, Asst. Atty. Gen. Civil Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

OPINION

SMITH, Chief Judge.

This contracts case comes before the court after the contracting officer denied the plaintiff's request for an equitable adjustment. It arose under an April 26, 1986 contract between J.R. Youngdale Construction Company, Inc. (Youngdale) and the United States Army Corps of Engineers (Corps), for the construction of a dental clinic at Fort Irwin, California. Based upon both parties' motions for summary judgment, their oral arguments, and an analysis of the law, the court grants the government's motion and denies the plaintiff's cross-motion. While this result may impose a real economic loss on the plaintiff, it is fundamental to the theory of contractual freedom to make parties responsible for their choices.

FACTS

On January 16, 1985, the Corps released solicitation no. DACA05-85-B-0045 for the construction of a dental clinic at Fort Irwin's desert training center. On March 6, 1985, the Corps determined that Youngdale was the low bidder at $2,373,379.00. Youngdale confirmed the amount on March 22, 1985.

Pursuant to Federal Acquisition Regulations (FAR), 48 C.F.R. §§ 9.104–1(c), 9.104–3(c), 9.105–1 (1984), the Corps requested a list of all contracts from Youngdale with the federal government in excess of $1,000,000.00. At the time plaintiff had eleven such government contracts. After hearing that seven of those contracts were not being performed satisfactorily, on April 22, 1985, the contracting officer determined that Youngdale was not a responsible bidder. The contracting officer then referred the matter to the Small Business Administration's (SBA) Regional Office for its determination on a Certificate of Competence (COC), per the FAR, 48 C.F.R. § 19.601 (1984).

Upon submission to the SBA, the Corps agreed to withhold award until May 24, in order to permit the SBA to make a determination. On May 22, the SBA notified the contracting officer that it would be "recommend[ing] to the [SBA] Central Office that the COC be issued." The contracting officer called the SBA's Regional Office to protest this response. On May 30, the contracting officer wrote the Regional Office, stating his disagreement with the SBA's recommendation. He further mentioned that both Youngdale and the next lowest bidder, Inland, had extended their bids to June 20. On June 11, the SBA Regional Office notified the contracting officer that the Central Office had the case for final disposition. The SBA also told the contracting officer that the 10–day appeal period mandated by the FAR, 48 C.F.R. § 19.-602–3(c) (1984), was to be held in abeyance until a decision had been reached.

On June 18, 1985, the Central Office notified the contracting officer that it did not have time to review the Regional Office's decision and would therefore grant the COC. On June 20, the Central Office again contacted the contracting officer, informing him that the case was in "suspense" pending possible appeal within the required 10–day period. The contracting officer did not reply. He awarded the contract to Inland, the next lowest bidder, on June 26.

Youngdale and the SBA appealed the contracting officer's actions to the Comptroller General. On October 28, 1985, the Comptroller General held that the contracting officer's actions were improper and that the contract should be awarded to Youngdale. The Comptroller General determined that the June 18 telephone conversation was sufficient notice under 48 C.F.R. § 19.602–3(b) (1984). Further, the Comptroller General pointed out that the contracting officer was by law required to accept the SBA's decision on the COC. 15 U.S.C. § 637(b)(7) (1982); 48 C.F.R. § 19.-602–4 (1984).

The Corps requested a reconsideration of the decision. On February 20, 1986, the Comptroller General issued decision B–219439.2, which affirmed his previous decision. In buttressing his finding, the Comptroller General cited a June 14 Corps memorandum, which Youngdale had received

pursuant to a Freedom of Information Act request, in which the following appears:

It is assumed that prior to or on 20 Jun [sic] 85, the SBA Central Office will telephonically contact the contracting officer or his representative. Per advice of legal counsel, the following outlines our strategy for action.

a. If SBA advises the contracting officer that their preliminary decision is to issue a COC but that a COC has not actually been signed by the appropriate SBA official, then the Corps should immediately award the contract to the second low bidder ...

b. If SBA has issued the COC, then the Corps must award to J.R. Youngdale....

Comp.Gen. B–219439.2, at 4–5 (February 20, 1986).

The Corps was required to award the contract to Youngdale, if Youngdale wished to accept. On March 11, 1986, the Corps wrote to Youngdale, requesting: that Youngdale hold open its bid for 120 days; that Youngdale confirm its willingness to accept at the original bid price of $2,373,379.00. This letter also stated that the Corps was aware of Youngdale's difficulty in getting the subcontractors to hold their bids.

In a telegram dated March 18, 1986, Youngdale assented to the Corps' demands, stating that, "this will confirm our willingness to accept the award of subject project in the amount of $2,373,379.00 and our further extension of that bid for an additional 90 days from this date." Youngdale and the Corps signed contract number DACA05–85–B–0045 on April 26, 1986.

Notice to proceed was given on June 16, 1986. Youngdale did not amend the contract to include damages or the right to pursue damages caused by the delay. There were no ancillary agreements.

On May 11, 1987, Youngdale made a certified claim to the Corps for an equitable adjustment of $462,597.00. Several of Youngdale's subcontractors' rates had increased.[1] On February 7, 1989, the Corps denied the claim.

## DISCUSSION

Youngdale, in its briefs and at oral argument, has alleged that the government is liable through an implied-in-fact contract. In the alternative, Youngdale argues that the government breached the express contract, ultimately signed on April 26, 1986, which contract included suspension and change of work clauses. Both arguments fail.

### Implied-In-Fact Contract

Addressing the implied-in-fact contract first, defendant, in its Motion for Leave to Bring Additional Authority to the Attention of the Court, cites the only apparent four-square case, *K–W Constr., Inc. v. United States,* 671 F.2d 481, 229 Ct.Cl. 413 (1982). *K–W* is not favorable to Youngdale.

In *K–W,* the plaintiff was scheduled to receive a contract to build a structure at Mather A.F.B. in California. Due to differences between the plaintiff's name on the bid and the plaintiff's name on the bid bond, the contracting officer rejected the plaintiff's bid. The plaintiff appealed to

---

1. The May 11, 1987 letter listed the following increased costs:

| | Firm | Original | Present | Overrun |
|---|---|---|---|---|
| A. | General Concrete | $178,000 | $247,000 | $69,000 |
| B. | Amber Steel | 49,281 | 52,639 | 3,358 |
| C. | Southern Painting | 11,792 | 12,231 | 421 |
| D. | Valley Electric/Curren Electric | 284,648 | 330,362 | 45,714 |
| E. | Resilient Floor/Carpet | 21,430 | 29,000 | 7,570 |
| F. | Ceramic Tile | 11,927 | 13,476 | 1,549 |
| G. | Insurance Costs | 57,558 | 91,210 | 33,652 |
| H. | Continental Hardware | 17,955 | 19,270 | 1,315 |
| | | $632,591 | $795,188 | $162,597 |
| | Loss of overhead | | | 278,987 |
| | Total | | | $441,584 |

the Comptroller General, who overturned the contracting officer's decision. Several months had elapsed in the interim.

At the end of the contract K–W asked for an equitable adjustment. The Court of Claims, in denying the plaintiff's claim, discussed K–W's "creative approach" to extending implied-in-fact contracts. The court recognized that government officials are presumed to be acting in good faith. *K–W Constr., Inc. v. United States*, 671 F.2d 481, 229 Ct.Cl. at 415 (citing *Sun Oil Co. v. United States*, 572 F.2d 786, 215 Ct.Cl. 716, 746 (1978)). To overcome the burden, the plaintiff in *K–W* argued that unreasonable delays caused by the government made it liable. *Id.* (citing *L.L. Hall Constr. Co. v. United States*, 379 F.2d 559, 177 Ct.Cl. 870, 878 (1966)). Since *Hall* generally applies to the contract administration period and not the formation period, the plaintiff wished to extend the doctrine to the pre-award phase, through *Heyer Prods. Co. v. United States*, 140 F.Supp. 409, 135 Ct.Cl. 63, 69 (1956). *Heyer* states that the government impliedly promises to "give fair and honest consideration to [the] bid[s]" submitted in response to the solicitation. *Id.*

The *K–W* court stated as follows:

We reject petitioner's creative approach to this case. Petitioner entered into a contract with the Government and now asserts a claim related to the performance of that contract. The suspension of work clause in the contract therefore governs petitioner's suit for damages resulting from Government-caused delay. This clause provides that in order for a delay to be compensable it must have been "for an unreasonable period of time" and caused "by an act of the Contracting Officer in the administration of this contract...." Because the delay in this case occurred *prior to* the administration of the contract, petitioner's claim for delay damages is not cognizable under the suspension of work clause as

ASBCA so found in its decision to deny petitioner's claim.

*K–W Constr., Inc. v. United States*, 671 F.2d 481, 229 Ct.Cl. at 416 (emphasis in original)(footnote deleted).

*Express Contract*

In its theory based upon a breach of the express contract's suspension and change clauses, Youngdale makes two arguments: the first concerns the language of the clauses; and the second involves case law that Youngdale asserts support its breach theories. Supporting the clause-based argument, Youngdale cites the FAR, 48 C.F.R. § 12.505 (1985), which requires insertion of clause 48 C.F.R. § 52.212–12 (1985), Suspension of Work, into both the solicitation and the contract. Notwithstanding Youngdale's arguments, the suspension and change clauses do not provide a means of providing legal redress since no contract existed until 1986. The Corps' improper actions occurred during the spring and summer of 1985. There is no case law supporting the enforcement of clauses included in solicitations for actions which occurred prior to award of the contract.[2] Further, there is no indication that either party intended to make the effective date of the contract any earlier than its execution, April 26, 1986. *See infra.*

As an alternative express contract argument, and in response to the government's citation of *K–W*, Youngdale refers to *De Matteo Constr. Co. v. United States*, 600 F.2d 1384, 220 Ct.Cl. 579 (1979), as precedent for finding either an express contract with a relation back to a prior event or an implied-in-fact contract under which Youngdale could get an equitable adjustment. *De Matteo* is not applicable to this case.

In *De Matteo*, the U.S. Postal Service (USPS) notified the plaintiff on June 18, 1974, that it was the lowest responsive bidder on a contract to erect a USPS building in Hartford, Connecticut. The USPS

---

**2.** In plaintiff's Motion for Summary Judgment and Opposition to Defendant's Motion for Summary Judgment, plaintiff cites numerous cases purporting to bolster its use of these clauses.

However, every cited case deals with delays or suspensions that occurred after the government and the plaintiffs had signed contracts. Youngdale does not cite any on-point cases.

sent De Matteo a contract to sign. De Matteo signed the contract and returned it on July 2, 1974.

On June 28, 1974, a competing bidder, OGE, protested USPS's determination that OGE was nonresponsive. The ensuing protest proceedings lasted over a month. On August 7, 1974, the USPS general counsel denied the protest. Two days later the USPS signed the contract. De Matteo received the executed copy on August 14, 1974.

De Matteo later requested and was denied an equitable adjustment for the delay caused by OGE's protest. De Matteo claimed that the suspension of work clause applied to events prior to the government's signing on August 9, 1974. The Court of Claims denied De Matteo's claim as the period of delay was not unreasonable per the suspension of work requirement. However, in holding that the clause had been triggered, the court found that the parties to the contract could and did make the effective date prior to the date of execution. Indeed, the contracting officer had retroactively dated the contract to June 27, 1974.

Leaving aside the issue of the reasonableness of the Corps' acts, there is no indication whatsoever that in the instant case, the parties intended the effective date of the contract to be other than the date of the contract's execution in April of 1986. Absent such intent, there can be no invocation of the contract's clauses. There can be no relation back to any events from June, 1985.

### Youngdale's Failure to Reserve Its Rights

The Corps' March 11, 1986 letter to Youngdale suggests that the Corps knew of Youngdale's difficulty in keeping its costs down to the 1985 levels. Youngdale's telegram dated March 18, 1986, does not mention its intention to reserve any rights, nor does either party indicate that any provision was added to the contract to cover Youngdale's losses.

The government cites a number of cases which state the proposition that the plaintiff generally cannot succeed on an equitable adjustment to a contract when it knew of the problems before signing the contract. In *Prestex, Inc. v. United States*, 3 Cl.Ct. 373 (1983), this court held that government-caused delay could not excuse the contractor's performance when at the time the contractor signed the contract it knew that not all of its subcontractors would hold open their bids. As stated *supra*, Youngdale knew that its costs had risen, and yet it did not seek to modify the contract to cover those costs, nor did it reserve its rights for later actions.

### CONCLUSION

The court therefore holds that there was not a contract, either express or implied, between Youngdale and the Corps, prior to April of 1986. The lack of a contract therefore precludes plaintiff from any recovery for the delay caused by the defendant's improper procedures. The defendant's motion for summary judgment is granted, the plaintiff's cross-motion for summary judgment is denied.