Per Curiam :
This case was referred to Chief Trial Commissioner Marion T. Bennett, with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Buie 57(a). The commissioner has done so in an opinion and report filed on February 29, 1968. On March 28, 1968, the parties filed a stipulation setting forth that neither party desires to take exception to the report of the Chief Commissioner and electing to submit the case on the report without exceptions. Since the court agrees with the commissioner’s opinion, findings and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case without oral argument. Therefore, plaintiff is entitled to recover and judgment is entered for plaintiff in the sum of $19,405.20.
*291 OPINION OP COMMISSIONER
Bennett, Chief Commissioner: Plaintiff’s petition asks damages of $43,650 for breach of contract on the basis that defendant released to plaintiff beyond the contract deadline certain buildings which plaintiff had contracted to demolish. Defendant clearly breached the contract since defendant alone caused the delay which hindered performance, the delay was unreasonable, and the contract did not contemplate nor excuse such delays. Commerce Int'l Co. v. United States, 167 Ct. Cl. 529, 338 F. 2d 81 (1964). There was no suspension-of-work clause in the contract which would permit an administrative adjustment of the contract price for these delays.
Plaintiff had no books or records to establish its actual costs.
Plaintiff attempted, but was unable, to prove that the equipment which was idled by defendant’s delay was rented, and that rental rates should be used to compute damages. Absent this showing, damages for this idle time are computed using Associated General Contractor (AGC) rates for contractor-owned equipment usage, minus one-half since there is no wear and tear during idle time. L. L. Hall Constr. Co. v. United States, 177 Ct. Cl. 870, 379 F. 2d 559 (1966). In L. L. Hall the equipment was contractor-owned. Here it is not absolutely clear that it was so owned, but there is total failure of proof it was rented, even assuming it was owned by another corporate entity well blended into plaintiff. Under the facts of the case it is found that application of AGC rates gives the most realistic approximation of plaintiff’s actual costs for idle equipment.
Plaintiff also sought damages for a brief period early in the demolition process when the defendant released a building for demolition and then rescinded the release and fixed a new release date. The building was finally released to plaintiff well before the contract deadline and the contract clearly contemplates some uncertainty in release dates within the limitations there provided. The defendant did not act unreasonably and no breach occurred here.
Plaintiff is entitled to damages for supervision during idle time. Plaintiff is also entitled to recover its actual cost of *292 renting equipment for another job when it could not use its idled equipment which otherwise would have been available.
The facts are more fully set forth in the findings which follow.
Findings of Fact
1. Plaintiff is a corporation organized and operating under the laws of the District of Columbia with its principal place of business in Washington, D.C., and is engaged in the business of demolition contracting, specializing in the razing of buildings.
2. Plaintiff was the successful bidder on contract No. GS-03B-14153 awarded June 2, 1964, by the United States, acting through the General Services Administration, for the demolition and removal of buildings designated Temporary Buildings T-30, T-31, T-32, Barton Hall and Curie Hall, located in West Potomac Park, Washington, D.C. The contract price was $64,500.
3. Section 2.06 of the Special Conditions of the contract contained the following provisions regarding a time for release of the buildings and for completion of the demolition:
SCHEDULE FOR DEMOLITION
a. Demolition and removal work for all of the building shall be based, so far as is practicable, on the vacancy of the premises by the occupying agency in accordance with the following anticipated Vacancy Schedule:
1. Vacancy Schedule
a. Tempo T-30 — vacated June, 1964.
b. Tempo T-32 — vacated June, 1964.
c. Barton Hall — vacated July, 1964.
d. Tempo T-31 — vacated August, 1964.
e. Curie Hall — vacated August, 1964.
b. Completion Times
1. Demolition and removal work for each building listed in the Vacancy Schedule shall be completed within sixty (60) calendar days from dates to be furnished in “Final Schedule of Work”.
2. All dates for the start of demolition and removal work by the Contractor as listed in the Vacancy Schedule above, are approximate only and are subject to adjustments that might be made necessary by the removal and relocation of existing services, equipment and *293 personnel, supply and shut-down and termination of existing services to buildings, etc.
3.Any adjustment by the Government in the dates for the start of demolition and removal work by the Contractor shall be made within and limited to a three (3) month period starting from the dates indicated in the Vacancy Schedule.
c. Approval
No demolition and removal work shall be performed for any building listed in the Vacancy Schedule or under this Contract without prior written approval by the Contracting Officer.
d. Final Schedules of Work
The Contracting Officer will furnish and issue to the Contractor “Final Schedules of Work” designating the dates that any building or group of buildings will be available for the start of demolition and removal work required under the Contract. The final schedules will be issued to the Contractor not less than two (2) weeks before the start of any scheduled demolition and removal work and within the limitation period of three (3) months hereinbefore specified.
4. Plaintiff was informed by defendant on June 26, 1964,. that T-30 would be vacated by July 1,1964, after which time it would be available for demolition under the contract. Defendant vacated this building by July 1 and plaintiff demolished it between July 13 and July 24.
5. Plaintiff was informed by defendant on July 9, 1964, that T-31 would be vacated by July 15, 1964, and available for demolition. On July 17 plaintiff was informed by letter that the July 15 release date was rescinded because of delay in relocating tenants of the building. Approximately 16 working days later, defendant released the building and plaintiff completed the demolition by August 31,1964.
6. Plaintiff was informed by letter on November 20,1964,. that Barton Hall was released as of November 11,1964, thus confirming prior oral notice. Plaintiff was also informed that utilities and other services for T-32 and Curie Hall should be maintained until further notice, which meant that the wings of Barton Hall could be demolished but the head-house would have to remain. Demolition of the wings was. completed by November 30,1964.
*294 7. Plaintiff was informed by letter on January 5,1965, that T-32 and Curie Hall would be vacated on January 13,1965. Plaintiff was also informed that demolition of the Barton Hall headhouse could also take place after January 13. Plaintiff then completed the job.
8. As shown in finding 3, several dates were given for release of the various buildings, and the Government had a 3-month period from the dates shown in the contract in which to release the buildings. The most reasonable interpretation of the contract is that the Government could release the buildings any time during the specified month, with the 3-month period running from the last day of the month indicated. The following chart shows each building, the latest possible date it could be released under the contract, the date actually released, and the number of idle working days between the latest possible release date and the date actually released, allowing for concurrent delays:

9. Defendant released T-30 on July 1, 1964, well before the September 30 deadline. There is no showing of delay.
10. Defendant released T-31 about August 10, 1964, after first informing plaintiff that the building would be released on July 15. The building was finally released well before the November 30 deadline. There was no showing of an unreasonable delay.
11. Defendant released Barton Hall for demolition of the wings on November 11,1964, 8 working days past the October 30 deadline. The rest of Barton Hall was released on J anuary 13,1965.
12. Defendant released T-32 on January 13,1965, 60 working days past the September 30 deadline, not counting the *295 period in November when plaintiff was demolishing part of Barton Hall.
13. Defendant released Curie Hall on J anuary 13,1965, 30 working days past the November 30 deadline.
14. Plaintiff was damaged for the days past the final possible release dates during which it could have worked but was idle. Plaintiff was idle after September 30,1964, the last date for the release of T-32, to November 11,1964, when part of Barton Hall was released. Plaintiff was further idled after November 30, 1964, when the partial demolition of Barton Hall was completed, through J anuary 13, 1965, when T-32, Curie Hall and the rest of Barton Hall were released. These two periods total 60 working days. It is on this number of days that delay-damages for breach will be assessed. During part of this period plaintiff was waiting for the release of more than one building, but damages will be assessed only for idle days regardless of how many buildings were being delayed concurrently.
15. Plaintiff used a 25-ton truck crane and an HD-11 front-end loader to demolish the buildings. Plaintiff had owned a loader and this particular crane but alleged that it rented this equipment from the H & H Contracting Company at a rate of $115 per day for the crane and $200 per day for the loader, including $40 per day for operators for each piece of equipment. Plaintiff’s president could not remember the date or details of the alleged sale of the crane to the H & H Contracting Company. The record shows only that plaintiff’s president assumed he had made an oral agreement with the H & H Contracting Company for the rental of the equipment. He could not specifically remember making such an agreement for this job. Further, plaintiff could produce no documentary evidence, such as a rental agreement, work record, or a bill to support the statement that the equipment was rented. As of the time of trial in August 1967, no bill had been received and no payment had been made for this rental. The record further shows that plaintiff was a 50-percent owner of the H & H Contracting Company and that plaintiff’s president was a “principal” of H & H. The record also indicates that while plaintiff had made no payments to H & H *296 for the purported rental of the equipment, plaintiff promptly paid for the rental of a crane from another company during the same period and made partial payments for a front-end loader from yet another company. No officer of H & H was called to substantiate an alleged oral agreement for the rental of the crane and loader, and no record of H & H was submitted in evidence showing rental payments received. The weight of credible evidence is insufficient to establish that a rental of the equipment did, in fact, occur.
16. There being a failure of proof of actual cosits or of rental as a basis for damages for idle equipment, rates established by the Associated General Contractors for contractor-owned equipment are used for they are found less likely to distort probable actual costs and most nearly to reflect them. The pertinent Contractors’ Equipment Ownership Expense manual of rates is in evidence and the rates therein are applied here. The crane cost $19,790.82. Using the AGO rate of 5.4 percent representing expense per working month for this particular equipment, and multiplying it by the cost of the equipment, a figure is arrived at which, divided by the average working hours per month, gives an hourly rate of $6.07. The crane was idle 60 days, or 480 working hours. The hourly rate times the idle time divided by one-half (for lack of wear and tear during the idle time) establishes plaintiff’s damages for this idle time as $1,456.80.
17. The front-end loader was acquired at a cost of $88,944.72. The expense per working month for this equipment as established by the AGC manual in evidence is 6.4 percent. A similar computation to that for the crane establishes the hourly rate for loader use at $14.16. This rate multiplied by the 480 hours of idle time divided by one-half establishes the damages for idle time for the loader as $8,398.40.
18. Plaintiff offered the testimony of its president that where contractor-owned equipment is used that it is necessary to employ a crane operator who is guaranteed $5 per hour for a 40-hour week whether the crane was working or idle. This is admittedly not true with respect to the front-end loader. It is plaintiff’s position that if it is not entitled to *297 rental rates for an idle crane, which rates would include the operator, it is entitled to recover the operator expense which is not allowed by AGrC rates. For the 60 days of idleness, the crane operator would thus have earned $2,400. As a part of pretrial procedure, plaintiff was ordered to produce and identify for audit and verification by defendant any books and records upon which it intended to rely. None were at any time produced in pretrial or at trial to substantiate this item of claimed expense nor was the operator identified in pretrial although defendant sought this by motion for call. The alleged operator was identified at trial but not produced as a witness. There is a failure of proof on tins item of the claim.
19. In late November 1964, plaintiff began demolition of a hotel in Washington and for this purpose had to rent a crane and loader similar to the equipment idled. This equipment was rented from companies other than H & H at the rates of $25 per hour for the loader and $30 per hour for the crane. It is clear from the record that plaintiff could have used the equipment which was idled at the temporary buildings demolition site to demolish the hotel. Plaintiff is entitled to recover the cost of the rental of this equipment after November 30, 1964, when the demolition of the wings of Barton Hall was completed, until the rest of the buildings were released after January 13, 1965. This period totaled 30 working days, or 240 working hours. At a rental rate of $55 per hour for the two pieces of equipment, plaintiff is entitled to $13,200 in compensation. These are the actual costs.
20. Plaintiff’s president served as the supervisor for the demolition of the buildings. Plaintiff is claiming his entire salary for the idle period as damages, but plaintiff’s president also attended to other duties. From the record it is impossible to compute precisely the amount of time which plaintiff’s president devoted to this particular job. A reasonable estimate, based on the information in the record, is that half of plaintiff’s president’s salary for the 60-day idle period should be allocated to this contract. The record shows that plaintiff received $225 per week during the specific period in question. Plaintiff was idled for 12 working weeks. On the basis of *298 $112.50 per week, plaintiff is entitled to recover $1,350 for loss of supervisory services.
CONCLUSION OF Law
Based on the foregoing findings of fact and opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover of and from the United States and judgment is therefore entered for plaintiff in the amount of nineteen thousand four hundred five dollars and twenty cents ($19,405.20).