**DEGENAARS COMPANY, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 93–80 C.**

United States Claims Court.

May 18, 1983.

See also, D.C., 555 F.Supp. 403.

James R. Scullen, Washington, D.C., for plaintiff.

Stephen G. Anderson, Washington, D.C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D.C., for defendant.

## OPINION

NETTESHEIM, Judge.

In a proceeding before the Armed Services Board of Contract Appeals ("ASBCA" or the "Board"), Degenaars Company ("Degenaars") sought an equitable adjustment based on delay and extra work performed in connection with a fixed-price contract to install certain paving and sewage draining systems at the Special Weapons Pilot Plant at Picatinny Arsenal, Dover, New Jersey. Rae Construction Co., Inc. ("plaintiff" or "Rae"), is the real party in interest, having subcontracted for the work at issue and having succeeded to Degenaars' claim pursuant to a settlement between the parties.

In its 1972 decision, issued in 65 printed pages, exclusive of tables, *Isaac Degenaars Co.*, ASBCA, 72–2 B.C.A. (CCH) ¶ 9,764, *modified on rehearing*, ASBCA, 75–1 B.C.A. (CCH) ¶ 10,998, the Board partially allowed the equitable adjustment. Review was timely sought in the United States Court of Claims.

## FACTS

The Army Corps of Engineers, U.S. Army District, New York, awarded Contract No. DA–30–075–ENG–9185 to Degenaars on March 16, 1960, for Construction of Support Facility for Special Weapons Pilot Plant, Picatinny Arsenal, Dover, New Jersey. The award was for a lump-sum price of $1,038,-900. Subsequently, on May 16, 1960, Degenaars subcontracted to Rae for the sum of $171,000 the storm drainage, sanitary sewer, and paving work for three new parking lots and certain new roads. Performance of this work was the subject of the dispute both here and before the Board (the "subject work"). The subject work was to proceed in phases beginning with excavating and installing the drainage and sewer systems, followed by backfilling and compacting around the system, then rough grading of the area, and finally paving.

The storm drainage work was apportioned between Degenaars and Rae, with Degenaars installing the concrete for the storm drainage system and supplying the pipe, castings, and manhole bases and covers for the storm and sanitary sewer system. Rae was responsible for installing the manholes themselves. Degenaars had formed a first-tier subcontract with Vaia Brothers for grading the areas to be paved.

Work on the first phase of the subject work, the storm drainage system, was scheduled to begin immediately upon inception of the prime contract. According to testimony by Degenaars' Project Manager, although the official contract progress schedule allowed for 85 percent completion by August 1960, Rae's storm drainage work could have been completed by June. He further testified that its paving could have begun early in June and have been completed within 30 days, absent the problems encountered in performance.

Rae planned to do only the paving phase of its subcontract itself and entered into a second-tier subcontract for $29,200 with Paul Toti for labor on the sewer and drainage systems, with Rae supplying necessary materials. Toti, in turn, contracted with Bassanese & Cobo Construction Co. ("Bassanese") to do the work. In practice, Toti supervised the subject work, excluding paving, through November 22, 1960, at which time he assigned his contract with Rae to Bassanese, who carried through to completion.

Rae moved equipment onto the site for the subject work on May 18, 1960. From the first attempt to excavate on May 20,[1] Rae encountered obstructions—ultimately

---

1. Degenaars' Project Manager testified that   May 23, 1960, was the first day of excavation.

over 100 that were not shown on the contract drawings.[2] The Board found that an incomplete and indefinite list of 40 obstructions was given to Rae after it had made its bid to Degenaars. The effect of those obstructions was to delay significantly performance of the subject work, since for each obstruction unearthed, work halted until the Government instructed on the course of action to follow. Nevertheless, the storm drainage system beneath the area to be paved was completed by August 25, 1960, but had not yet begun on a sector of the subject work known as "Phipps Road." Some limited storm drainage work was done on Phipps Road in December 1960.

Vaia Brothers, responsible for grading and compacting, did not begin work until September 16, 1960, because Degenaars had kept it on other items of the prime contract. Problems with water close to the surface impeded compaction and slowed Vaia Brothers' work, as did the job interruptions. On one occasion in October, work stopped when the Government's Resident Engineer diverted Vaia Brothers and Rae to prepare a site for a dedication ceremony.

Rae commenced the paving phase of the subject work on October 12, 1960. The Board found that by early December 30 percent of paving and 90 percent of the storm drainage work had been completed. A blizzard soon thereafter essentially closed down progress on the subject work for the remainder of the winter.

Rae resumed paving on April 4, 1961, and continued throughout the summer to completion on approximately September 1, 1961. Storm drainage work on the Phipps Road sector of the subject work did not begin until September 1; the Government maintained a work stoppage on that sector until July 12, 1961, while it redesigned the work. The Board found two reasons for delay from July until September 1961. First, the parties disputed the compensation allowable for the changed Phipps Road work, and until September Rae's second-tier subcontractor, Bassanese, was unavailable. Work on the storm drainage moved fitfully to completion on December 3, 1961. Rae closed out its work on the site in January 1982, including some grading work on the Phipps Road sector it had taken over from Vaia Brothers.

Degenaars, on behalf of itself, sought from the Contracting Officer additional compensation for extra work performed over the lump-sum contract price. By letter of August 8, 1961,[3] Degenaars asked for $46,893, most of which was for Rae's invoices covering the subject work, and $4,220 of which was for "general contractor overhead" and "profit." The Contracting Officer's decision letter of June 2, 1965, allowed $3,620 of the claims, plus ten percent overhead for Degenaars, for a total amount of $4,008, as well as seven days for extra work and delays. A second claim submitted by Degenaars sought $133,233 and a 75 day time extension, $114,623 of which was based on Rae's activity on the subject work. The Contracting Officer's decision of June 2 allowed $12,838 of Rae's claim, plus overhead for Degenaars, for a total of $14,213, and allowed 21 days' extension for completion of the storm drainage system. On August 4, 1965, the Contracting Officer issued a third decision, which is not in the record.

With respect to Degenaars' total claim for $904,119 based on 158 items for changed work and expenses due to delays, the Contracting Officer in principle conceded that an equitable adjustment was proper and partially allowed 85 items amounting to $17,089. The costs for delay and extra work were deemed conjectural and duplicative of other claims already considered.

2. Degenaars' consolidated complaint before the Board listed, as examples, 84 unmarked obstructions on the job site.

3. Plaintiff has challenged the bona fides of the Board in adjudicating its claims within a reasonable time. The former Court of Claims is also criticized for its treatment of plaintiffs' claims. A recapitulation of the procedural history demonstrates plaintiff's substantial contribution to the unjustifiable longevity of this case. The observation is warranted, however, that from March 1980 through early 1982, plaintiff labored fruitlessly to advance its case because most of the administrative record had been misplaced by defendant.

By letter of July 1, 1965, postmarked July 6, 1965, Degenaars noted its appeal to the Board from the June 2 decisions of the Contracting Officer, which became Appeal No. 11045. Degenaars elected to bypass an intermediate hearing of the Army Corps Board of Contract Appeals. A second appeal, No. 11083, was consolidated with No. 11045 by consolidated complaint of January 4, 1966. Defendant's motion to dismiss based on an untimely filing was denied on May 9, 1966. *Degenaars Co.*, ASBCA, 66–1 B.C.A. (CCH) ¶ 5,569.

A prehearing conference was held by the Board on February 16, 1967. It was agreed that the case would be heard as a quantum matter on the basis of Rae's subcontract costs. Entitlement was conceded by defendant, but the issues of bid inadequacy, job quality, and cost allowability and allocation were reserved. Pursuant to the ensuing order, defendant commissioned an audit of Rae's books and records by the Defense Contract Audit Agency. Trial was scheduled for June 12, 1967, but delays in completion of the audit caused a postponement until March 26, 1968. Once commenced, the hearing proceeded through April 10, 1968, and was adjourned in order to allow the parties to analyze the cost data adduced at trial and to review further plaintiff's records. The hearing reconvened on February 5, 1969, and continued through February 15. Plaintiff's post-hearing brief was delayed at its request from May 15 until November 1, 1969, because of the press of other business, and the illness of Richard A. Ench ("Ench"), a principal of Rae. Briefing was completed in September 1970, and the Board rendered its decision over two years later on October 30, 1972.

During the pendency of the appeal to the Board, Rae and Degenaars skirmished over the subject work in the United States District Court for the District of New Jersey. Rae sued Degenaars under the Miller Act, 40 U.S.C. §§ 270a—270d (1976 & Supp. V). That litigation culminated in a settlement of June 18, 1967. Rae was obligated by the settlement to assume responsibility for prosecuting Degenaars' appeal before the Board; the settlement also provided that "any payment" issued to Degenaars as a result of the appeal "shall be endorsed over to the order of Rae Construction Company, Inc., without deduction or allowance." The settlement permitted Rae to use Degenaars' name in the Board appeal and recited the necessity for the avoidance of a direct assignment, which was prohibited by law. Sometime in 1977 Degenaars apparently executed a Contractor's Release (the "1977 Release")[4] of the United States of America covering Contract No. DA–30–075–ENG–9185. The 1977 Release excepted 15 claims from discharge, which the Court of Claims subsequently ordered to be reviewed.

Before the Board plaintiff challenged the compensation allowed by the Contracting Officer. Because plaintiff alleged that the work performed exceeded the scope of the March 16, 1960 contract, it reasoned that an equitable adjustment would follow pursuant to ¶ 3 "Changes" and ¶ 4 "Changed Conditions" of the General Provisions. Plaintiff claimed additional costs in the categories of materials; equipment rentals; labor; salary for Ench; interest on loans taken out during the performance of the subject work; cash expenditures; minor miscellaneous invoices; and markups for profit, overhead, and bond expenses. The Government was credited for original work, unchanged by the obstructions, as follows: $86,724 for Degenaars' cost for paving work unaffected by the obstructions; $20,200 for

---

4. A copy of the 1977 Release attached to Plaintiff's Motion for Summary Judgment, filed Nov. 11, 1982, as Exhibit II at 5, bears an execution form, undated, save for the year "1977." A line appears for "Issac Degenaars Company," but the exhibit copy is unsigned. Plaintiff's Response to Defendant's Cross-Motion for Summary Judgment and Reply to Defendant's Opposition to Plaintiff's Motion for Summary Judgment, filed Mar. 21, 1983, at Exhibit B reproduces the 1977 Release and also, in addition to pages annexed to the previous submission, a copy of an Army Finance Check No. 281,998 dated August 4, 1977, payable to Issac Degenaars Co., in the amount of $88,131. The same exhibit page contains a signed receipt from Rae indicating that the check was endorsed over to Rae.

the storm and sanitary system; and $26,253 for extraneous costs—for a total of $133,177. Plaintiff sought $581,496 for changed conditions created by the unmarked obstructions as subcontract (Rae) costs and, calculating markups for Rae (overhead @ five percent plus profit @ ten percent) and Degenaars (overhead and profit @ ten percent together, plus .065 percent bond expense), reached a total claim of $743,593. Without adding the markup, the original work and subcontract costs aggregated $714,673.

Defendant asserted three offsets and challenged the cost computations. These deductions encompassed the alleged unreasonableness of the original Rae bid to Degenaars, payments already made by Degenaars to Rae, and a penalty for job inefficiencies or substandard work. Defendant urged an equitable adjustment, including certain markups, and adjustments for the reasonable value of the subject work of $37,515 for the second-tier subcontract work of Toti and Bassanese, which included ten percent overhead and profit for Rae, and five percent for Degenaars. Defendant would have allowed Rae's costs at $167,911 plus five percent for overhead and five percent for profit for a total of $183,092. Defendant would have reduced this amount by five percent for job inefficiencies, thereby producing $173,937 in total allowable costs. Degenaars had paid Rae $261,576. That figure was reduced by $35,378 representing items not paid for Rae's work alone. Deducting from $219,393 the total allowable costs, $173,937, yielded $45,456, which the Government calculated as Rae's profit on the subject work.

The major portion of the contested amount, equipment rentals, concerned the difference between the Associated Equipment Distributors Rental Rates ("AED"), sought by plaintiff, and the Associated General Contractor Ownership Expense Rates ("AGC"), argued by defendant on the ground that the equipment at issue was under the common control of both Rae, as rental user, and the lessor.

The facts concerning equipment rentals begin with Rae's lease of certain equipment from G.I. Heusser shortly after Rae subcontracted with Degenaars on May 25, 1960. Pursuant to another agreement, additional equipment was rented from the estate of Emma Ench. Both contracts called for rental at AED rates, 1959, eleventh issue. There existed a strong degree of interrelationship between Rae, Heusser, and the Ench estate. G.I. Heusser was the president of Rae and the wife of Ench. Ench was the manager of Rae, as well as an officer of the company. Ench's minor son, A. Richard Ench, was the beneficial owner of a majority of Rae stock by inheritance from Ench's sister, Emma Ench; A. Richard also owned the Ench Estate equipment, which by direction of Emma's will was to be managed by Ench. Emma Ench's executrix was Margaret Brophy, Rae's chairman of the board. The Board accepted AGC rates as the appropriate measure of equipment expense.

The Board allowed an equitable adjustment of $88,131, an increase of $71,042 over the Contracting Officer's decision. On rehearing an additional $7,533 item was allowed. Over five years later, plaintiff filed on March 3, 1980, in the Court of Claims to recover $785,299.

Plaintiff's petition alleged six errors. Defendant answered on June 4, 1980, denied all errors and asserted as an affirmative defense the finality of the Board's decision, contending that any further evidence the court required must be obtained through Board proceedings on remand. Defendant also filed on June 4 what purported to be the administrative record from the Board consisting of three bound volumes of the eleven originating with the Board. Trial Judge Ronald A. Hogenson then ordered plaintiff to move for summary judgment by August 29, 1980. During the seven extensions of time preceding the filing of its summary judgment motion, plaintiff twice substituted counsel, designating current counsel on May 11, 1981. On May 7, 1981, pursuant to an Order of January 30, 1981, plaintiff was required to show cause on June 1, 1981, why the case should not be dismissed for nonprosecution.

The show cause order was vacated on May 20, 1981, and plaintiff was granted an extension to June 30, 1981, to file appropriate papers. On June 15, 1981, plaintiff moved to extend its time to September 10, 1981, to file its motion for summary judgment, arguing its need to study 15 claims or issues not before considered by counsel and to locate and review transcripts of the proceedings before the Board. This motion was denied on July 2, 1981, due to the filing on June 30, 1981, of plaintiff's motion for summary judgment. The two-page motion—without supporting memorandum—disclaimed any dispute as to material facts and protested that without the transcripts of the Board proceeding "presently available in New York City and with counsel for the government...", plaintiff was unable to prepare a moving brief. Plf's Motion for Summary Judgment, filed June 30, 1981, at 2.

On August 17, 1981, defendant cross-moved for summary judgment, appending the Board's decisions, and argued that the claims were barred by the statute of limitations and that plaintiff's motion, without a brief, contained no arguments that defendant could address. Plaintiff countered that it was handicapped by the incomplete Board record, but that the arbitrary and capricious decision below *"fairly leap[s] from the record offered to this Court by the defendant's exhibits [i.e., the Board decisions]."* Plf's Reply, filed Sept. 11, 1981, at 20–21 (emphasis in original). After two extensions defendant's reply followed on November 16, 1981.

At this point the deficiency in the record filed by defendant crystallized. On January 22, 1982, the Court of Claims rejected defendant's statute of limitations argument noting that "[t]he court has perhaps been less than adequately attentive to his several representations to it that plaintiff cannot prepare a proper motion without access to this record...." and ruled that without the transcript of the Board proceeding the court could not apply the Wunderlich Act test of substantial evidence to the contested factual issues identified by plaintiff in its reply. Pursuant to former Court of Claims Rule 164, the court ordered defendant to file the entire record within 30 days. Further, the pending motions were referred to the Trial Division "for consideration of such contentions as the parties may raise as to the 15 contested items reserved by plaintiff.... The parties shall be accorded opportunity by the trial judge to amend their motions to enumerate and discuss each reserved item." The court concluded by expressing its desire to proceed with the case "with all reasonable speed" because of the age of the 1960 contract generating this dispute.

Defendant was granted, over plaintiff's opposition, two extensions of time, and on March 31, 1982, moved for leave to file a reconstructed copy of the administrative record. Plaintiff opposed this motion and sought to have defendant's motion for summary judgment dismissed and to obtain judgment on the pleadings. On April 8, 1982, the trial judge denied defendant's motion and recommended interlocutory review of the decision to exclude the reconstructed administrative record. Defendant so moved on April 19, 1982. Then, in a pleading filed on May 4, 1982, defendant requested leave to file the certified administrative record, stating that two boxes of the record as transmitted from the Army Corps of Engineers to the Justice Department—which comprised the missing record—had been discovered on May 3, 1982.

In a series of three orders issued on May 11, 1982, the Court of Claims permitted the filing of this record; denied defendant's interlocutory review request as moot; and referred plaintiff's April 7, 1982 pleading to the trial judge for resolution of any remaining issues. Plaintiff sought leave to oppose defendant's motion to file the administrative record on May 13, 1982, and moved for reconsideration of the May 11 orders. Leave to file the opposition was granted on May 27, but the motion for reconsideration was denied that day. The trial judge on July 2, 1982, directed plaintiff to examine the record as filed for deficiencies and established the final briefing schedule on the cross-motions for summary judgment now

before the court. Briefing was completed after reassignment to this court, and the parties presented oral argument on April 29, 1983.

## DISCUSSION

■ This court's inquiry under the Wunderlich Act, 41 U.S.C. §§ 321–22 (1976), is delimited by the rule that the Board's findings of fact will not be disturbed if supported by substantial evidence or not fraudulent, or arbitrary or capricious, or so grossly erroneous as to imply bad faith, although legal conclusions will be examined anew. *BCM Corp. v. United States,* 2 Cl.Ct. 602, at 605 (1983) (NETTESHEIM, J.) (citing cases).

Degenaars' March 1980 petition in the Court of Claims alleged the following Board errors: failure to allow compensation as provided in Rae's contracts for rental of equipment; failure to allow proper compensation for rental value of equipment confined by defendant to the job when not reasonably required for use on the subject work; incorrect use of AGC rental rates, rather than AED rates for computing the cost of the rental equipment, contrary to "the contract"; failure to allow as an expense the interest paid on loans incurred to finance the extra work required by the changed contract; and incorrect denial of the subcontractor's markups for profit, ignoring in this regard the status of Degenaars, not Rae, as plaintiff. Plaintiff's subsequent briefs added a claim based on fraud.

### 1. *Fraud*

The January 22, 1982 order of the Court of Claims directed the trial judge to permit the parties to address the 15 items reserved in the 1977 Release of the United States by Degenaars. These items, which are encompassed within plaintiff's petition, have been argued in plaintiff's cross-motion for summary judgment. The order permitting further briefing did not refer to the issue of

fraud. Fraud, nevertheless, is plaintiff's major single argument. Plaintiff asserts that fraud can be adduced by reviewing the transcript of the Board's proceedings. In particular, plaintiff contends that defendant had a duty to inform plaintiff of the obstructions and that the failure to do so was fraud. Plaintiff further alleges that defendant's Resident Engineer on numerous occasions affirmatively defrauded and lied to plaintiff. Allegedly he lied by withholding knowledge of the obstructions and thereby induced plaintiff to take the contract; he lied to keep plaintiff on the contract by promising rental payments at AED rates; he promised plaintiff that payment and remedies for the obstructions were forthcoming. The Resident Engineer is said to have asserted a nonexistent right to "confiscate" plaintiff's equipment and to have extorted $3,000 from Denegaars to pay for his approval of the extra costs.

Defendant opposes the plea in fraud on three grounds: 1) Fraud was not pleaded with the particularity required of former Court of Claims Rule 33(b) (now USCCR 9(b)); 2) Degenaars' 1977 release of the United States did not reserve fraud, and, therefore, consideration of fraud is barred; and 3) fraud was not raised before the Board, and plaintiff thus is estopped from asserting it here.[5]

Any of these arguments is sufficient to bar the fraud contentions. Not only did plaintiff fail to plead fraud with particularity, *see Baskett v. United States,* 2 Cl.Ct. 356, at 365–66 (1983) (LYDON, J.), but fraud was not pleaded at all.

Sometime in 1977 plaintiff apparently executed a release with the United States reserving 15 items for which it could still seek relief against defendant. *See supra* note 4 and accompanying text. The court is constrained to qualify the Release as apparently executed, because it is not signed by plaintiff, although it appears to be signed by Rae for the purpose of receipting a

---

5. At oral argument defendant also noted that the statute of limitations would have run inso-

far as fraud in the inducement is asserted.

check from the United States to Degenaars endorsed over to Rae. The validity of the release was not put in issue. If valid, as the court assumes, the failure to except fraud from operation of the Release forecloses plaintiff's claim. *Hellander v. United States,* 147 Ct.Cl. 550, 561, 178 F.Supp. 932 (1959). Nonetheless, the January 22, 1982 order did not direct the trial judge to permit briefing on fraud, but only to brief further on the 15 items reserved in the 1977 Release.

■ Lastly, plaintiff's failure to raise the fraud issue before the Board precludes considering it in a Wunderlich Act review. *William F. Klingensmith, Inc.,* 205 Ct.Cl. 651, 665, 505 F.2d 1257, 1265–66 (1974). Plaintiff asserts that fraud is an issue which is beyond the competence of the Board and may be heard only by a court, citing *Estate of Mulholland,* 165 Ct.Cl. 231 (1964). *Mulholland* holds only that fraud is a question of fact and that resolving the applicability of a statute of limitations is not appropriate until the factual question of fraud, which would serve to toll the statute, is determined. Plaintiff also cites *Mayfair Construction Co.,* NASA BCA, 81–1 B.C.A. (CCH) ¶ 15,065; *Fidelity Construction Co.,* DOTCAB, 80–2 B.C.A. (CCH) ¶ 14,819; and *Aywon Wise & Metal Corp.,* ASBCA, 63 B.C.A. (CCH) ¶ 3,912. These cases state that fraud is not cognizable by a board of contract appeals. In each case the Government charged the contractor with presenting a fraudulent claim for payment,[6] whereas in this case Rae/Degenaars, the plaintiff subcontractor, charges the government's agents with acts of fraud. Boards however, do entertain a contractor's fraud allegations. In *Hedlund Lumber Sales, Inc.,* GSBCA, 70–1 B.C.A. (CCH) ¶ 8,242, the board considered the contractor's assertion that the government's representative fraudulently induced the contractor to enter into the contract by promising extensions of delivery dates. Although not the basis for the decision, the board in *Hedlund* stated that no evidence in the record supported the contractor's allegation.

■ Even if a board lacks power to hear a fraud claim at a contractor's behest, plaintiff cannot advance its position in this court. Fraud is a tort, and this court does not have jurisdiction to consider claims sounding in tort. *E.g., Eastport Steamship Corp. v. United States,* 178 Ct.Cl. 599, 372 F.2d 1002 (1967). As stated in *Somali Development Bank v. United States,* 205 Ct.Cl. 741, 749, 508 F.2d 817, 821 (1974), "The decision of the Supreme Court in *United States v. Neustadt,* 366 U.S. 696, 81 S.Ct. 1294, 6 L.Ed.2d 614 (1961), removes any doubt that claims based on negligent misrepresentations, wrongful inducement, or the careless performance of a duty allegedly owed, are claims sounding in tort." Plaintiff does not allege merely inadvertent or negligent mistakes, but pervades its pleadings with insinuations of scienter, which, if properly presented would mean that "the petition would clearly have to be dismissed as a demand, founded in tort, for business damages due to misconduct." *Eastport Steamship Corp. v. United States,* 178 Ct.Cl. at 611, 372 F.2d at 1011; *see Baskett v. United States,* 2 Cl.Ct. at 365.

■ Despite the infirmities in plaintiff's effort to argue fraud on review, the court exercises its discretion to consider fraud (plaintiff contending that fraud is demonstrated by the record without the need for trial) in the interest of contravailing any prejudice to plaintiff from the almost two years wasted attempting to deal with the case based on an incomplete Board record. *See supra* note 3. Plaintiff's allegations have been examined to the extent they are non-tortious (*e.g.,* promissory estoppel to deny use of AED rates) or otherwise cognizable by the court[7] to ascertain

---

6. Pursuant to 31 U.S.C. § 232 (1976) (the "False Claims Act"), jurisdiction for fraud against the United States lies in the district courts.

7. Plaintiff's brief alleges fraud not only by defendant's agents, but also by Degenaars. This court has no jurisdiction to hear complaints against a defendant other than the United States.

whether the record discloses fraud by defendant. *Cf. Baltimore Contractors, Inc. v. United States,* 226 Ct.Cl. 394, 643 F.2d 729 (1981). Although each of plaintiff's citations to the record has been read,[8] this exercise did not indicate fraud.[9]

Plaintiff's citations consistently fall far short of supporting the propositions for which they are offered. For example, plaintiff's factual statement asserts that the water problems on the site were "known to Arsenal Engineers" and delayed Rae for months. Plf's Motion for Summary Judgment, filed Nov. 12, 1982, at 14 (hereinafter "Plf's Memo"). If supported, the allegation would supply an element of active concealment or misrepresentation to the fraud theory. Citations to the transcript at pages 191, 1,381, and 1,385 indicate only that water existed and make no reference to defendant's knowledge of the condition.[10]

Plaintiff charges that defendant "knew" with certainty that obstructions existed and offers six citations to the transcript. Plf's Memo at 21. Two of the six citations (tr. at 171, 226) refer to the discovery of obstructions after starting work, two (*id.* at 698, 699) refer to the receipt by the contractor of the partial list of obstructions after performance started, one (*id.* at 1,072) refers to the procedures used to handle obstructions as they were discovered, and one (*id.* at 121) refers to a statement by defendant's Resident Engineer that the drawings were accurate based on his personal inspection. Three of these citations have nothing to do with defendant's alleged "certain knowledge" of the obstructions; the two citations

referring to the list of obstructions were considered by the Board, 72–2 B.C.A. (CCH) ¶ 9,764, at 45,599–600; and the last one could indicate, in connection with other proof, that the Resident Engineer was concealing knowledge.

Plaintiff offers four citations in urging that the Resident Engineer "lied" to induce Rae to stay on the job by urging a "novel breakdown of costs to purchase time." Plf's Memo at 24. One citation (tr. at 228) reveals that the Resident Engineer agreed to deal with the obstructions, another (*id.* at 276) shows that he realized that costs were increasing, and the last two (*id.* at 563, 564) establish that he sought a detailed invoice so payment could be made on a time and materials basis.

The only new fact proffered by plaintiff indicative of fraud is contained in an affidavit of Ench (attached to Plaintiff's November 12, 1982 Motion for Summary Judgment). This affidavit is of questionable admissibility. However, in the interest of completeness, the court notes that Ench alleges a November 10, 1960 meeting with the government Resident Engineer and Degenaars' Project Manager at which the former discussed his receipt of $3,000 from Degenaars to approve the extra costs incurred on the subject work. This statement juxtaposes with a Board disallowance for lack of proof of a $3,600 non-invoiced cash expenditure on October 10, 1960, for "special use." 72–2 B.C.A. (CCH) ¶ 9,764, at 45,615. Even if the inference of a payoff were better supported, plaintiff would not be aided because any payoff implicites

---

**8.** The court notes that defendant chose not to contest or address any of plaintiff's factual citations, but rested on the Board's decision, including its record citations.

**9.** At oral argument in response to a question of the court, plaintiff "clarified" its pleadings and stated that it alleged fraud by the Contracting Officer and Resident Engineer, as well as by the Administrative Judge. Asked for record examples to support a claim of judicial impropriety, plaintiff later cited the transcript at 1,623 as an example of collusion between the government attorney and the presiding judge. The citation reveals no more than that government counsel discussed the progress of the

audit (which took ten months, rather than the two contemplated in the original Board schedule) with the Administrative Judge and plaintiff's attorney.

**10.** Plaintiff's Memo at 18 implies that Rae, at Degenaars' request, backdated its May 16, 1960 second-tier subcontract to April 25, 1960, which in some way indicates fraud, although leaving the logical inference supporting that conclusion to be bridged by the court. Since the obstructions themselves and the list of obstructions did not come forward until after May 16, it remains unknown how this backdating could evidence fraud.

plaintiff's participation in a fraudulent scheme (items 1, 2 and 4 in the 1977 Release) which under the False Claim Act, *see supra* note 6, would forfeit its right to payment.

This opinion is spared further discussion of plaintiff's vituperative allegations of fraud. Each has been examined. Taken together they reveal no more than what the Board found and defendant conceded: that the subject work exceeded the specifications rendered by defendant. On that basis defendant was and is liable for the extra costs, a matter of quantum.

### 2. The Rental Rates (Items 1, 2, and 4 of the 1977 Release)

The Board used AGC rates for pricing the Heusser, Ench, and Toti/Bassanese equipment rentals.[11] As to Heusser and Ench, plaintiff protests that no control of either by Rae appears in the record. The Board found that plaintiff failed to prove a bona fide, arm's length rental occurred and based its decision on the family connection between Rae, R.A. Ench, and the Ench, Heusser entities. 72–2 B.C.A. (CCH) ¶ 9,764, at 45,620–22. Rae used its equipment preferentially over other equipment; it acted, in fact, as a pool for Rae's use. The court finds substantial evidence in the record to support this finding.

Plaintiff does not challenge this finding, but argues that since Rae did not have legal ownership of the equipment, the family ties are irrelevant and AED rates should apply. The legal test to avoid AGC rates, however, in a case of delay and increased work is that the contractor must show that the equipment was actually rented. *Cornell Wrecking Co. v. United States,* 184 Ct.Cl. 289, 291 (1968). As noted by the Board, AGC rates include profit and depreciation factors, 75–1 B.C.A. (CCH) ¶ 10,998, at 52,381, which in some circumstances involving fully depreciated equipment can lead to a windfall profit for the owners. *L.L. Hall Construction Co. v. United States,* 177 Ct.Cl. 870, 886, 379 F.2d 559 (1966).

The cases cited by defendant to support the Board's decision are distinguishable. *Weaver v. United States,* 209 Ct.Cl. 714 (1976) (order granting defendant's motion for summary judgment) involved 100 percent ownership of the allegedly rented equipment by the delayed contractor. In *Meva Corp. v. United States,* 206 Ct.Cl. 203, 511 F.2d 548 (1975), ownership does not appear; however, the AGC rates there were higher than the rental amounts billed by the contractor. Even *Cornell Wrecking Co. v. United States,* 184 Ct.Cl. 289, relied upon by the Board, involved direct 50 percent ownership of the rented equipment by the contractor. Despite the factual distinctions between these cases and the instant suit, the court concludes that the principles articulated in defendant's authorities apply here. Plaintiff must show that its equipment was rented, absent which AGC rates apply. 184 Ct.Cl. at 291. The Board found plaintiff did not show that it had rented the Heusser and Ench equipment, and the court has determined that this finding is supported by substantial evidence and legally correct.

The owner of the Heusser equipment, who was the spouse of Rae's manager (Ench), both followed his instructions on allotment of equipment and was also president of Rae and mother of their minor son, A.R. Ench, beneficial owner of Rae. The executrix of the Ench Estate, M.M. Brophy, was also chairman of the board of Rae and voted 90 percent of its shares in trust for A.R. Ench. Ench was by will the manager of the Ench Estate equipment and of Rae. The parties worked closely together[12] in managing these business interests. 72–2 B.C.A. (CCH) ¶ 9,764, at 45,596–98, 45,621–

---

11. Plaintiff makes much of the failure of defendant to inform it of the existence of Article 15 of the ASPR, which governs contract cost principles and procedures during the contract. That point is misplaced because the Board did not rely on the ASPR in making its decision. 72–2 B.C.A. (CCH) ¶ 9,764, at 45,621.

12. Ench for Rae and his wife for Heusser signed the rental agreements for the Heusser equipment, whereas the roles reversed for rental of the Ench Estate equipment by Rae. 72–2 B.C.A. (CCH) ¶ 9,764, at 45,597–98.

22. The equipment existed as a pool for the use of Rae. 72–2 B.C.A. (CCH) ¶ 9,764, at 45,622. Plaintiff has not shown the necessary distance between lessor and lessee to prove a valid rental.

The use of AGC rates presents little problem for the Toti and Bassanese equipment. Both parties owned 100 percent of the equipment they used.

### 3. Rental Value for Idle Time (Item 3)

■ Plaintiff seeks compensation for the rental value of the equipment while confined to the job and alleges that threats kept the property on the job site. The Board allowed compensation for one period (June to Sept. 1960) at 50 percent of AGC rates.[13] Insufficient evidence was found of attempts to remove the equipment after the request coincident with the December 1960 snowstorm. 75–1 B.C.A. (CCH) ¶ 9,764, at 52,380. Plaintiff proffers a statement by Degenaars' Project Manager that before he left the job on December 29 or 30 he made other requests of the Resident Engineer to remove the equipment. Tr. at 758–60.

Plaintiff stated in the Board hearing that it would produce letters requesting removal of equipment sent after December, but these were not forthcoming. 75–1 B.C.A. (CCH) ¶ 9,764, at 52,380. The Board reasoned that a single request followed by silence over four months would not support an inference that the equipment was held on the job by defendant's order. Even if the court were to credit the Project Manager's testimony and find that the facts were a three-week series of December requests followed by three months of silence, that would not undercut the Board's inference.

Plaintiff lists 12 citations, Plf's Memo at 39, to support threatened confiscation of equipment during the winter season. Five relate to the snowstorm, (tr. at 260, 758, 973, 1091, 1273); two relate to snow removal, but not to "threats" (id. at 1,100, 1,099); one reflects Ench's perception that he had a right to remove the equipment (id. at 1,097); and the rest either do not relate to

removal (id. at 959–71, 1,375, 1,378) or involve a question, not a witness' answer (id. at 1,094). None of these citations reflects "threats."

### 4. Underbidding (Item 5)

■ Plaintiff asserts that the Board erroneously deducted $16,378 from the award on account of underbidding by Rae. The Board, on the basis of testimony by an expert witness, found that defendant's pre-work estimate of $47,378 was reasonable and that Rae's bid of $31,000 was unreasonably low and thus deducted the difference from the award. Because this finding is based on the determination of the credibility of the expert, whose credentials were well established, 75–1 B.C.A. (CCH) ¶ 10,-998, at 52,381, the court will not disturb this finding.

### 5. The Interest on Loans (Item 6)

Plaintiff alleges that the Board arbitrarily and capriciously ignored evidence and refused to find that Rae incurred borrowing debts. Plaintiff misconstrues the Board's finding, which was not that these loans did not exist, but that their relationship to the subject work was not shown, especially in light of the five percent markup allowed Rae which subsumed in part interest expenses. 75–1 B.C.A. (CCH) ¶ 9,764, at 52,-381. Of plaintiff's nine citations, three refer to matters not related to interest on loans (tr. at 899, 900, 922), while the other six (id. at 716–18, 924, 1,439, 1,442) can only be read to evidence that the loans were made, not that the five percent markup allowed Rae was insufficient to cover such expenses.

### 6. Subcontractor's Markups (Items 7(a)–15)

■ Plaintiff argues that the Board improperly denied its markups for Toti and Bassanese equipment rentals, a claim covered by Release Item 7(a). As noted by the Board, AGC rates already include such

**13.** A 50 percent rate adjusts for the lack of wear and tear on the equipment while idle.

*L.L. Hall Constr. Co. v. United States,* 177 Ct.Cl. at 886, 379 F.2d 559.

markups. 75–1 B.C.A. (CCH) ¶ 9,764, at 52,381. Release item 7(b) requests markup for compensation for extra work which has not been allowed. Item 7(c) is similarly a request for Rae's markup for the disallowed items 7(a) and (b). Item 8 requests a markup for the difference between AGC and AED rental rates on the Heusser equipment, which, because the court does not allow AED rates, cannot be marked up. Items 9 and 10 seek markups for the disallowed rental rates of the Ench equipment and the winter rental adjustments, neither of which was allowed by the Board or this court. Item 11 is a similar markup request for disallowed Toti and Bassanese rental rates. Item 12 covers a request for markup on another disallowed item, the underbidding deduction, as is Item 13 for the disallowed interest expense.

Items 14 and 15 seek Degenaars' markups as prime contractor. Payment of this sum would be a windfall to Rae because of its June 18, 1967 agreement with Degenaars to receive all sums resulting from this litigation. 75–1 B.C.A. (CCH) ¶ 9,764, at 52,381. Degenaars is before this court in name only, and this markup is not one of Rae's expenses. Moreover, to be entitled to this level of markup Rae would be required to stand in Degenaars' shoes. That plaintiff does not purport to be Degenaars, however, is inferable from its allegations that Degenaars, as well as the Government, defrauded Rae. Finally, an assignment of this claim would contravene 31 U.S.C. § 203 (1976).

## CONCLUSION

For the foregoing reasons, defendant's cross-motion for summary judgment is allowed, and plaintiff's is denied. The petition will be dismissed.

IT IS SO ORDERED.

Costs will not be assessed due to the matter discussed *supra* note 3.