**SHEA–S&M BALL, a joint venture, Appellant,**

v.

**MASSMAN–KIEWIT–EARLY, a joint venture, et al.**

**No. 78–1102.**

United States Court of Appeals, District of Columbia Circuit.

Argued March 15, 1979.

Decided Aug. 2, 1979.

Rehearing. Denied Sept. 6, 1979.

---

Opinion for the Court filed by VAN DUSEN, Senior Circuit Judge.

VAN DUSEN, Senior Circuit Judge.

## I. INTRODUCTION

This appeal is from a December 2, 1977, district court judgment after a non-jury trial, awarding plaintiff, Shea-S&M Ball (Shea), $14,000.00 in damages. Shea commenced this action sounding in contract and tort against Massman-Kiewit-Early (MKE) and the Washington Metropolitan Area Transit Authority (WMATA) as a result of recurrent overflows of water from MKE's construction site onto Shea's.[1]

■ The trial court found that MKE was obligated under §§ 3.4 and 3.6.9[2] of its

James L. Whitten, Washington, D. C., with whom Neal Henry Hundt and Conrad D. Philos, Washington, D. C., were on the brief, for appellant.

Thomas Pace, Washington, D. C., with whom James F. Jordan, Washington, D. C., was on the brief, for appellee, Massman-Kiewit-Early.

James C. Gregg, Washington, D. C., for appellee, WMATA.

Before BAZELON and ROBINSON, Circuit Judges, and VAN DUSEN,* Senior Cir-

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

1. Shea and MKE are joint venture construction firms. Each contracted separately with WMATA for the construction of different segments of the Washington Metropolitan Area Subway System. The C–4 contract which was obtained by Shea consisted of the tunnel south of the Foggy Bottom Metro Station. The C–3 contract which was obtained by MKE consisted of the Foggy Bottom Metro Station and the tunnel to the north of the station. The C–3 work and the C–4 work were contiguous and joined at the south end of the Foggy Bottom Metro Station (interface).

There is no dispute among the parties that groundwater of flood proportions flowed from MKE's construction area onto Shea's area and that the source of this water was the overflowing of a steel, corrugated sewer built by MKE. Nor is there a dispute that Shea's site was flooded by such groundwater on seven occasions.

2. §§ 3.4 and 3.6.9 state in part:
"3.4.2 GENERAL

.    .    .    .    .

"Prior to actual installation of the system, the Contractor shall submit complete working drawings indicating the type of dewatering system he proposes to use. The working drawings shall include the arrangement, location and depths of the proposed system, a complete description of the equipment to be used and procedure to be followed, standby equipment and the proposed location or locations of points of discharge of water. The method proposed

for removal and disposal of water shall insure that properties, buildings or other structures, sewers and other utility installation, pavements and sidewalks and any other work will not be damaged by these operations.

"Any method of controlling groundwater selected by the Contractor which, after installation and while in operation, causes or threatens to cause damage to existing buildings, structures, utilities or facilities shall be modified at no additional cost to the Authority. The Contractor shall be responsible for monitoring the quality of the discharge from the dewatering system to determine if soil particles are being removed by the system. The Contractor's responsibility shall also include making and evaluating measurements of movement in the adjacent area to determine if movements are being caused by the dewatering operations. Any damage, disruption or interference resulting directly or indirectly from such operations shall be repaired or restored by the Contractor, subject to the approval of the Engineer and at no additional cost to the Authority.

.    .    .    .    .

"3.6.9 STORM, SANITARY AND COMBINED SEWER FACILITIES
The Contractor shall conduct his operations so as not to interfere with the service provided by existing sewers and laterals from adjoining properties. All sewer work must be coordinated with the construction staging and maintenance of traffic plan shown on the contract drawings. The Contractor shall submit for review and approv-

contract with WMATA to control ground-water within its area and to prevent the sewer from overflowing. Shea was found to be a third-party beneficiary of that contract. Although MKE was found to have breached its contract, the trial court limited Shea's recovery because it found that the first flood was caused by an act of God, the later floods were foreseeable, and Shea did not properly mitigate its damages.[3] The court never reached the question of whether MKE was negligent as it concluded that Shea could not recover on its negligence claim because it was "contributorily negligent in failing to take the obvious steps to avoid the injury" (8a).[4] Finally, the trial court found that WMATA had no duty to supervise or enforce its solution to the flooding problem.[5]

Because we have concluded that there was insufficient evidence in the record to support the district court's conclusion that the first flood was an act of God, and that district court applied an incorrect rule of law in concluding that Shea did not properly mitigate damages, and erred in concluding that WMATA had no duty to resolve disputes between adjoining contractors, we reverse the December 2, 1977, judgment and remand the case to the district court

for further proceedings consistent with this opinion.

## II. ACT OF GOD

The first flood, which occurred on June 21, 1973, could only be an act of God if the rains were "an unprecedented and extraordinary occurrence of unusual proportions and could not have reasonably been foreseen by the parties." *Barnard-Curtiss Company v. United States,* 257 F.2d 565, 568 (10th Cir. 1958). *Accord, Gleeson v. Virginia Midland R'D Co.,* 140 U.S. 435, 11 S.Ct. 859, 35 L.Ed. 458 (1891); *UniRoyal, Inc. v. Hood,* 588 F.2d 455 (5th Cir. 1979); *Marriott Corporation v. Norfolk and Western Ry. Co.,* 319 F.Supp. 646 (E.D.Mo.1970); *Garner v. Ritzenberg,* 167 A.2d 353 (D.C. Mun.App.1961); 1 C.J.S. Act of God 1423 (1936). There is no evidence in the district court record upon which the court could conclude that the rains that caused Shea's damages were extraordinary or unusual. The record is completely devoid of any evidence of the normal range of rainfall in Washington, D. C., and the amount of rain that actually fell during the time periods when the floods occurred.

---

al of the Engineer his detailed schedule and working drawings for temporarily supporting sewers and laterals, or otherwise handling flows in these lines during construction by pumping, fluming or other approved means."

3. The trial court, at page 7 of its findings of fact and conclusions of law, stated:

"Shea's right to sue under the breached contract by no means ensures success in that suit. Shea knew that floods had occurred and were likely to continue. It knew that MKE was doing nothing to prevent them. And it was well aware that it had readily available the means to prevent continued damage at relatively little expense simply by diking the water flow at or near the interface on one jobsite or the other and allowing the water to back up into the immediately adjacent excavated area on MKE's jobsite. Yet Shea did nothing. Indeed it refused to act even after a dike was suggested by WMATA at the February 1974 meeting and MKE expressed its willingness to pump out the water as it accumulated behind the dike. Although MKE had the responsibility to prevent the

flow after the first flood, the law does not permit an injured party in Shea's shoes to stand idly by, accumulating damages with each successive flood while refusing to take obvious, reasonable steps which would have greatly mitigated or prevented the harm." (7a)

As a result, the court awarded Shea the costs of erecting and removing a dike.

4. This court affirms this conclusion of the district court. As to the first flood, the trial court will have to determine on remand whether the danger was sufficiently obvious and foreseeable so as to require a finding of contributory negligence.

5. In February 1974, after the third flood, the parties to this suit participated in a meeting in an attempt to solve the flooding problems. WMATA suggested that Shea build a dike and MKE expressed a willingness to pump out the water that collected behind the dike. WMATA took the position that under the contract it only had the power to offer suggestions and could not enforce any of its suggestions.

█ Heavy rainfalls, unless they are unusual and extraordinary, are not considered acts of God. *Marriott Corporation v. Norfolk and Western Ry. Co., supra; McCarthy v. District of Columbia,* 168 A.2d 910 (D.C. Mun.App.1961); *Garner v. Ritzenberg, supra.* The *Garner* court stated:

"We take judicial notice that rains of heavy intensity and average duration are occurrences of common experience. This event was described as a flash flood. People often use that expression in describing accumulations of rain water running off along natural or artificial contours of the ground; but that imports no particular legal significance. Such events, though infrequent, are to be expected. They do not create the widespread devastation commonly associated with earthquakes, tornadoes, hurricanes or extraordinary floods. The occasional filling of low-level or basement areas by rain water is a probable and foreseeable result of a heavy rain. To classify it as an act of God is an unwarranted extension of that doctrine not supported by the authorities."

*Garner v. Ritzenberg, supra* at pages 354–55.

█ The trial judge concluded that the first flood was an act of God in the absence of evidence that the rainfall was extraordinary or unusual. Because the defendants did not introduce sufficient evidence for a trier of fact to conclude that the first rainfall was an act of God, this defense must fail. Since we agree with the trial court that the plaintiff is the third-party beneficiary of a contract between the defendants and that MKE breached that contract by allowing rain water to flow onto Shea's construction site, upon remand the trial court will have to make a determination of the damages Shea incurred as a result of the first flood.[6]

## III. MITIGATION OF DAMAGES

The trial court granted Shea only a small portion of its damages, despite the fact that it found that MKE had breached its duties under the contract. The district court concluded that Shea had not properly mitigated its damages by failing to build a dike at or near the interface. *See* footnote 3.

██ Although the law does not permit an injured party to stand idly by, accumulating damages, when certain obvious, reasonable steps, if taken, would have greatly reduced the damages, the law does not penalize the nonbreaching party in the type of situation that is before this court.

"Where both the plaintiff and the defendant have had equal opportunity to reduce the damages by the same act and it is equally reasonable to expect the defendant to minimize damages, the defendant is in no position to contend that the plaintiff failed to mitigate. Nor will the award be reduced on account of damages the defendant could have avoided as easily as the plaintiff. *See* Dobbs, Handbook on the Law of Remedies § 3.7 at 186 (1973). The duty to mitigate damages is not applicable where the party whose duty it is primarily to perform a contract has equal opportunity for performance and equal knowledge of the consequences of nonperformance. *See Parker v. Harris Pine Mills,* 206 Or. 187, 291 P.2d 709 (1955)."

*S. J. Groves & Sons Co. v. Warner Co.,* 576 F.2d 524, 530 (3d Cir. 1978). *Accord, McCarty v. United States,* 185 F.2d 520 (5th

6. An act of God must be caused exclusively and directly by natural causes.

". . . when the effect, the cause of which is to be considered, is found to be in part the result of the participation of man, whether it be from active intervention or neglect, the whole occurrence is thereby humanized and removed from the operation of the rules applicable to the acts of God." *Fred Drew Construction Co. v. Mire,* 89 A.2d 634, 636 (D.C.Mun.App.1952). *Accord, Mid-*

*daugh v. United States,* 293 F.Supp. 977 (D.Wyo.1968); *McClaskey v. United States,* 261 F.Supp. 912 (D.Or.1966); 1 C.J.S. Act of God 1423 (1936). The trial judge also erred in determining that the first flood was an act of God without determining whether or not MKE's negligence contributed to the flooding. The trial judge specifically stated that he made no determination as to MKE's negligence.

Cir. 1950); *Unverzagt v. Young Builders, Inc.*, 252 La. 1091, 215 So.2d 823 (1968); *Parker v. Harris Pine Mills*, 206 Or. 187, 291 P.2d 709 (1955); 22 Am.Jur.2d Damages § 37 (1965); 25 C.J.S. Damages § 34 (1966). MKE breached its contract by allowing surface water to run off its jobsite onto Shea's jobsite. Pursuant to its contract with WMATA, MKE had the primary responsibility for controlling its water runoff and had the same opportunity as Shea to build a dike that would have prevented the damages. MKE also had knowledge of the consequences of nonperformance. Therefore, the doctrine of mitigation of damages is not applicable. On remand, the district court will have the opportunity to recalculate Shea's damages in accordance with this opinion, if Shea presents sufficient evidence to form a basis for such recalculation.[7]

### IV. CLAIM AGAINST WMATA

With respect to plaintiff's claims against WMATA, the district court held that:

"WMATA through its engineers and consultants undertook to advise and consult with its contractors and supervised their performance against specifications. It convened the February 1974 meeting in an attempt to arrive at a reasonable solution. Beyond this it had no duty, contractual or otherwise, to enforce its resolution of a dispute between two adamant contractors who had contractual obligations to cooperate and remedy a problem wholly within their control." (8a)

We disagree with this conclusion of the district court. Section 1.14 of the contracts in question are as follows:

"The Authority may undertake or award other contracts for additional work, and the Contractor shall fully cooperate with such other contractors and Authority employees and carefully fit his own work to such additional work as may be directed by the Contracting Officer. The Contractor shall not commit or permit any act which will interfere with the performance of work by any other contractor or by Authority employees."

In *Hoffman v. United States*, 340 F.2d 645, 166 Ct.Cl. 39 (1964), which involved similar provisions in contracts [8] between the United States and contractors who were constructing parallel bridges 500 feet apart on the same river, the court held that the United States had an obligation under the contract to secure the cooperation of the upstream contractor for the benefit of the downstream contractor. The court went on to state:

"These rights inured through the right of the Government to require cooperation from this subcontractor through the Government contract with the prime contractor, the State of Oregon. There is no evidence that defendant ever attempted to secure this cooperation, other than arranging for one unsuccessful conference with Young & Smith who refused to make any changes 'because nobody offered to pay for it.'

" . . . For the Board to say, under circumstances where the contracting officer himself found the acts of the contractor upstream to be the cause of plaintiff's delay, that 'the contracting officer is not designated by the contract as the arbiter and quite properly refused to take sides in the matter,' is a complete and unwarranted disavowal of all responsibility on the part of the Government to direct or require cooperation from anyone (except

---

7. The taking of additional damage testimony will be a matter for the discretion of the trial judge.

8. "Article 3(b) of defendant's contract with the State for the highway bridge required:

'b. The Government may award other contracts for additional or other work in connection with the same project or in the same vicinity. The State shall conduct operations so as to cooperate fully with any such work being performed by the Government and/or

Government contractors and *shall carefully fit its own work to that provided under other contracts as directed by the Contracting Officer*. The State shall not commit or permit any act which may interfere with the performance of any such work by the Government and/or any Government contractor.' (See Findings—Appendix D) [Emphasis supplied.]"

*Hoffman v. United States, supra* at page 649.

plaintiff). Such a conclusion by the Board is erroneous as a matter of law and not supported by the substantial evidence in the administrative record."

*Id.* at pages 650–51.

██ The contracting authority has the duty to invoke its contractual rights to compel cooperation among contractors. Abutting contractors enter into contracts such as are present here with entities such as WMATA with the expectation that supervisory authority will be exercised to insure cooperation. *Cf. Paccon, Inc. v. United States,* 399 F.2d 162, 185 Ct.Cl. 24 (1968); *L. L. Hall Construction Co. v. United States,* 379 F.2d 559, 177 Ct.Cl. 870 (1966).

██ In this case, as in *Hoffman,* the contracting authority limited the exercise of its supervisory authority to the arranging of an unsuccessful conference, when it had a duty to compel cooperation. Shea had a right to expect cooperation from MKE and to expect WMATA to enforce § 1.14 for Shea's benefit. WMATA's failure to exercise its supervisory function and compel cooperation has resulted in their breach of a contractual duty owed to Shea. Therefore, the district court erred in concluding that Shea's cause of action against WMATA lacked merit.

### V. CONCLUSION

The case will be remanded to the district court for further proceedings in accordance with this opinion.[9]

9. The determination that the first flood was not an act of God on this record may make it necessary to ascertain such matters as (a) whether there was fault in the failure of MKE to warn Shea of the accumulating water, (b) whether the suspended substitute sewer line was the substantial cause of the accumulation of water, (c) to what extent the award to Shea of $14,000. must be increased due to the conclusion in parts II and III of this opinion, etc.