51 F.3d 265
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Lyn A. CAMPBELL, M.D., Plaintiff-Appellee,
v.
SOUTHEAST EMERGENCY PHYSICIANS GROUP, P.C., Defendant-Appellant.
 No. 94-1273.
 United States Court of Appeals, Fourth Circuit.
 Argued Jan. 30, 1995.
Decided March 31, 1995.
 
 ARGUED: Alfred Francis Belcuore, II, MONTEDONICO, HAMILTON & ALTMAN, P.C., Washington, DC, for appellant. Claude Alexander Allen, BAKER & BOTTS, L.L.P., Washington, DC, for appellee. ON BRIEF: Stephen L. Teichler, BAKER & BOTTS, L.L.P., Washington, DC, for appellee.
 Before ERVIN, Chief Judge, MOTZ, Circuit Judge, and PHILLIPS, Senior Circuit Judge.
 OPINION
 PER CURIAM:
 
 
 1
 This case involves issues of interpretation of an employment contract and defenses under that contract. A jury awarded Dr. Lyn A. Campbell $129,000 for breach of his employment contract by his former employer, Southeast Emergency Physicians Group (Southeast). We affirm.
 
 I.
 
 2
 Southeast is an independent contractor providing doctors and physician assistants to operate emergency rooms at two hospitals located in the Washington, D.C., metropolitan area. In February of 1992, Southeast hired Dr. Campbell to work at one of its affiliated hospitals, Greater Southeast Community Hospital (GSCH), located in Washington, D.C. On February 14, 1992, Dr. Campbell and Southeast executed a twelve-page, integrated employment contract that provided that Dr. Campbell would perform emergency medical services on behalf of Southeast for 183 twelve-hour shifts per year in exchange for a monthly salary of $10,483 for the first two years, and for a salary to be determined thereafter. The agreement further provided that Dr. Campbell would be eligible for bonuses after one year of employment.
 
 
 3
 The agreement also contained a lengthy section 12, titled "Termination," which included the following subsection regarding Southeast's ability to terminate Dr. Campbell without cause:
 
 
 4
 (b) Employer's Termination Without Cause. The Employer may terminate the Employee without cause by an eighty (80) percent vote of the Board of Directors of the Employer, upon the giving of not less than thirty (30) days written notice to the Employee. If the Employee is termi nated without cause, the Employee shall receive full salary and benefits for one year following the termination but shall not receive a bonus or pay for vacation time during this one year period.
 
 
 5
 The next subsection, clause 12(c), was titled "Employer's Termination For Cause" and stated that the employment relationship "shall terminate upon and as of the date of any of the following events, without advance notice required of the Employer...." This language was followed by a list of twelve specific bases upon which Dr. Campbell could be dismissed "for cause." Section 12 then concluded with the following language:
 
 
 6
 If this Agreement and the employment relationship between the Employee and the Employer is terminated for cause for any reason set forth in subparagraph (c) above [Employer's Termination For Cause], the Employee shall be entitled to receive the amounts due to the Employee through the date of termination and no additional amounts.
 
 
 7
 Dr. Campbell began his employment at GSCH pursuant to this contract on July 1, 1992. On August 24, 1992, Dr. Kenneth T. Larsen, president of Southeast, circulated a memorandum indicating that, due to economic hardship, Southeast would be eliminating two physician assistant positions. However, it soon became apparent to Dr. Larsen that, unless financial conditions improved, Southeast would be required to reduce its workforce by one or two physicians as well. Shortly thereafter, on October 26, 1992, Dr. Larsen informed Dr. Campbell by telephone that Southeast's Board of Directors had voted to eliminate Dr. Campbell's position as part of Southeast's reduction in force.
 
 
 8
 Following notification of the dismissal, Drs. Larsen and Campbell agreed to the following termination letter:
 
 Dear Lyn:
 
 9
 It is my unpleasant task to inform you that the Board of Directors of Southeast Emergency Physicians Group, PC [sic] has met in an emergency meeting and has deleted your position. This is due only to our current financial position and our projected inability to pay you the wages we discussed when you were hired. I want to make it very clear that this is unrelated to your clinical performance or any sense of lack of commitment to the group.
 
 
 10
 Sincerely,
 
 
 11
 /s/ Kenneth T. Larsen, Jr., MD, FACEP
 
 
 12
 Three Southeast physicians also agreed to write letters of recommendation for Dr. Campbell, including Dr. Larsen, who called Dr. Campbell "a fine gentleman and a professional who works well with his peers and ancillary staff." Dr. Larsen credited Dr. Campbell with "an excellent fund of knowledge which he applies extremely well to clinical situations." Southeast also agreed to purchase "tail" insurance[1] for Dr. Campbell for the period following his termination.
 
 
 13
 On December 23, 1992, Dr. Larsen drafted letters of resignation to GSCH and Southeast's insurer on behalf of Dr. Campbell. However, due to Dr. Campbell's concerns that the letters improperly suggested that he was resigning voluntarily, Dr. Larsen offered to write another resignation letter for Dr. Campbell. Someone else signed Dr. Campbell's name to this subsequent letter and Dr. Larsen forwarded the letter to GSCH. Dr. Campbell officially left his position with Southeast on December 31, 1992.
 
 
 14
 On August 6, 1993, Dr. Campbell filed a complaint in United States District Court for the Eastern District of Virginia alleging that his discharge was without cause and that Southeast breached the employment contract by failing to compensate him according to the agreement. In a parallel case, another district judge later found that, as a matter of law, Southeast's dismissal of another physician as part of a reduction in force constituted a termination without cause under the terms of Southeast's employment contract. Szewczyk v. Southeast Emergency Physicians Group, No. 93-872-A, slip op. at 5 (E.D. Va. November 9, 1993). Based on this parallel adverse ruling, Southeast conceded in its pre-trial brief in the case at hand that it would not litigate this issue in the district court but instead would "acquiesce ... to the prior ruling, ... preserv[ing][its] contrary position for appeal." Thus, at trial in the present case, Southeast sought only to prove that there were grounds justifying Dr. Campbell's termination for cause under the terms of the employment contract even if his dismissal had not been necessitated by economic hardship. Southeast also asserted several affirmative defenses, including equitable estoppel, in response to Dr. Campbell's claim of breach of contract.
 
 
 15
 Following a two-day trial, the jury returned a verdict in favor of Dr. Campbell, awarding damages in the amount of $129,000. The court subsequently denied Southeast's motions for judgment as a matter of law and for a new trial. Southeast timely appealed.
 
 II.
 
 16
 Southeast's primary claim involves interpretation of the employment contract.[2] Southeast argues that the district court erred in ruling in the Szewczyk case that the dismissal of a physician pursuant to a reduction in force is a termination "for cause," as a matter of law, under the employment contract. Dr. Campbell counters that Southeast is barred from raising the issue under the theory of offensive collateral estoppel and that, in any event, a reduction in force is a termination without cause under the terms of the employment contract. We need not reach the question of whether Southeast is estopped from relitigating this issue because, even assuming Southeast is not collaterally estopped, the contract clearly provides that the dismissal of a physician pursuant to a reduction in force is a termination without cause.
 
 
 17
 Clause 12(c), "Employer's Termination For Cause," limits termination for cause to "any of the following events." This language evidences the parties' intent that the subsequent list of twelve specific instances of employee conduct is intended to be an exhaustive list of events constituting cause for termination under the agreement. Southeast's argument that this list was intended simply to provide examples of cause, and not a definition of cause, cannot be squared with the contract language. It defies logic that contracting parties, seeking only to provide examples of what might constitute cause, would undertake to list twelve such examples, without in anyway indicating that the twelve are merely illustrative, i.e., without providing language stating that cause "included but was not limited to" or that the named instances were only "examples."
 
 
 18
 The language that immediately follows this list in subparagraph (c) of section 12, provides further support for the conclusion that the list was intended to be exhaustive. That language provides:
 
 
 19
 Before the Employee is terminated for cause under paragraphs (iv), (v), (viii) or (ix) above, the Employee shall be counseled twice by a committee established by the Board of Directors of the Corporation under the rules to be promulgated by the Board.
 
 
 20
 By referencing only four, instead of all twelve, of the specific items on the list as warranting counselling, the parties manifested their understanding that each of the twelve instances of employee conduct should be viewed individually and particularly, and not merely as examples of a broad category of events.
 
 
 21
 If any doubt remained as to the exclusive nature of the twelve-item list, it was foreclosed by the last paragraph in section 12 of the contract:
 
 
 22
 If this Agreement and the employment relationship between the Employee and the Employer is terminated for cause for any reason set forth in subparagraph (c) above, the Employee shall be entitled to receive the amounts due to the Employee through the date of termination and no additional amounts. It seems clear that, had Southeast not intended subsection 12(c) to provide the exclusive definition of termination for cause, it would not have included the language "for any reason set forth in subparagraph (c) above" in this paragraph.[3]
 
 
 23
 Southeast itself acknowledges that it is a "fundamental rule that the parties are assumed to have intended that the language employed in an integrated contract should have its plain, commonly-understood meaning in expressing their agreement." Shoney's, Inc. v. Schoenbaum, 894 F.2d 92, 97 (4th Cir.1990). Moreover, Southeast drafted this contract and it is well settled that any ambiguity in a contract must be construed against the drafter. Commonwealth Edison Co. v. United States Dept. of Energy, 877 F.2d 1042, 1045 (D.C.Cir.1989); Meade v. Prudential Ins. Co. of America, 477 A.2d 726, 728 n. 1 (D.C.1984).
 
 
 24
 Finally, District of Columbia case law provides no support for Southeast's position. The two cases generally defining the term "cause" cited by Southeast, Hodge v. Evans Fin. Corp., 823 F.2d 559, 568 (D.C.Cir.1987), and Brock v. Mutual Reports, Inc., 397 A.2d 149, 153 (D.C.1979), are inapplicable because Southeast has included its own definition of "cause" in the employment contract. Southeast's argument that, sitting in diversity, we should apply the "prevailing rule" that a termination pursuant to a reduction in force is a termination for cause is meritless. As Southeast concedes, the District of Columbia has adopted no such rule. Furthermore, not one of the thirteen cases cited by Southeast purportedly following this "prevailing rule" has done so in a case involving an employment contract that specifically defines cause for termination.[4] See, e.g., Losacco v. F.D. Rich Constr. Co., 992 F.2d 382, 384-385 (1st Cir.), cert. denied, --- U.S. ----, 114 S.Ct. 324 (1993); Gianaculas v. Trans World Airlines, Inc., 761 F.2d 1391, 1395 (9th Cir.1985). Accordingly, we decline to apply the asserted rule in this easily distinguishable case.
 
 III.
 
 25
 Southeast next argues that the district court erred in denying its motion for judgment as a matter of law as to its equitable estoppel defense. By accepting what Southeast calls its "severance package"--the "favorable" termination letter, the three letters of recommendation and the tail insurance--Southeast asserts that Dr. Campbell waived his right to further compensation under the terms of the contract. Southeast therefore contends that, as a matter of law, Dr. Campbell is equitably estopped from receiving any benefits under the employment contract. Assuming, without deciding, that this argument has been properly preserved for appellate review,[5] it nevertheless fails.
 
 
 26
 In order to have established an equitable estoppel defense, Southeast must have demonstrated that: 1) Dr. Campbell knowingly made a false representation; 2) Dr. Campbell made this false representation with the purpose of inducing Southeast to act; 3) Southeast was ignorant of the true facts; and 4) Southeast relied on the false representation to its detriment. American Sav. v. Bell, 562 F.Supp. 4, 9 n. 10 (D.D.C.1981).
 
 
 27
 Southeast failed to prove even that Dr. Campbell made a false representation. Southeast concedes that Dr. Campbell made no express misrepresentations, but argues that by accepting the severance package and concealing his true desire to pursue the one-year salary provision under the contract, Dr. Campbell falsely represented his intent to Southeast. Although mere silence may constitute a false representation for estoppel purposes, this is true only where the silent party has a duty to speak. Id. at 9. As Southeast itself acknowledges, "the evidence was in conflict about whether or not Dr. Larsen specifically told Dr. Campbell what he would receive as his severance package." Without such a discussion between a Southeast representative and Dr. Campbell, it is hard to see how Dr. Campbell was even arguably under a duty to reveal his intention to seek compensation under the contract. Furthermore, where the factual evidence with regard to a particular element of a defense is conflicting, we must respect the jury's decision. See United States v. Saunders, 886 F.2d 56, 60 (4th Cir.1989).
 
 
 28
 In addition, the record contains conflicting evidence as to whether Southeast suffered any detriment as a result of the severance package. For example, it is not at all clear that the termination letter and the recommendation letters were, as Southeast argues, provided to Dr. Campbell involuntarily. The record also indicates that Southeast did not even purchase the tail insurance until March 3, 1993, more than four months after Dr. Campbell was notified of his termination. Moreover, the employment contract specifically provides that Southeast will provide malpractice insurance for Dr. Campbell during the term of the agreement. Since the tail insurance that Southeast purchased only covered Dr. Campbell during the period he worked at GSCH, a jury could reasonably have concluded that Southeast purchased the tail insurance, not in reliance on Dr. Campbell's representations, but because it was required to do so by the terms of the employment agreement. In sum, there was a sufficient basis for the jury's finding that Southeast failed to establish the estoppel defense by a preponderance of the evidence. See Shea-S & M Ball v. Massman-Kiewit-Early, 606 F.2d 1245, 1249 (D.C.Cir.1979).
 
 IV.
 
 29
 Southeast also raises two evidentiary issues on appeal. First, Southeast argues that testimony regarding Dr. Campbell's clinical performance before and after his employment by Southeast was inadmissible character evidence, as well as being irrelevant. In fact, as Southeast concedes, the trial court refused to admit this evidence when Dr. Campbell attempted to offer it during his case-in-chief. However, during Dr. Campbell's rebuttal, the court allowed the testimony of Dr. Edith Hambrick and Dr. Eugene Passamani, both of whom testified regarding Dr. Campbell's level of work performance outside of GSCH.
 
 
 30
 This evidence was properly received during Dr. Campbell's rebuttal case. As the district court made clear in its post-trial order denying Southeast's motion for judgment as a matter of law, the testimony of Drs. Hambrick and Passamani was admissible to rebut Southeast's evidence showing that Dr. Campbell lacked discipline, as well as to rebut Southeast's claim that Dr. Campbell's work performance was lacking during his employment at GSCH. When Southeast introduced evidence during its case-in-chief of Dr. Campbell's poor work ethic at GSCH, it clearly placed Dr. Campbell's diligence in issue. Thus, contrary to Southeast's argument, Fed.R.Evid. 404(a) did not require the exclusion of this testimony. Crumpton v. Confederation Life Ins. Co., 672 F.2d 1248, 1252 (5th Cir.1982); see also 1 McCormick on Evidence Sec. 186, at 787 (John W. Strong ed., 4th ed. 1992) ("If a person's character is itself an issue in the case, then character evidence is crucial"). Under such circumstances, Dr. Campbell was permitted to rebut this evidence with testimony concerning his good work ethic.
 
 
 31
 Furthermore, despite Southeast's claims, the testimony of Drs. Hambrick and Passamani was relevant for much the same reason. Once Southeast had placed Dr. Campbell's discipline in question, any testimony concerning his good work habits became relevant to disproving Southeast's claim that it had other bases upon which it could have dismissed Dr. Campbell for cause. See Fed.R.Evid. 401. Moreover, the district court carefully limited the testimony of Drs. Hambrick and Passamani to discussion of Dr. Campbell's work ethic. The court refused to admit any extraneous testimony from the two witnesses that might have been irrelevant or prejudicial to Southeast's case.[6] Accordingly, the district court did not abuse its discretion in admitting this limited rebuttal testimony from Drs. Hambrick and Passamani. As for the weight to be given to the testimony once admitted, that is a matter properly left to the jury. United States v. Arrington, 719 F.2d 701, 704 (4th Cir.1983), cert. denied, 465 U.S. 1028 (1984).
 
 
 32
 Finally, Southeast contends that the district court should have admitted evidence that Dr. Campbell taped two conversations with his colleagues without their permission in December of 1992. The district court properly concluded that, since both tape recordings took place more than a month after Southeast notified Dr. Campbell that he was being terminated, the evidence was not relevant to the issues at trial. The district court was well within its discretion in concluding that the tape recordings were irrelevant to determining whether the employment contract had been breached at the time of Dr. Campbell's dismissal. See Brinkley-Obu v. Hughes Training, Inc., 36 F.3d 336, 355 (4th Cir.1994).
 
 V.
 
 33
 For these reasons, the jury verdict awarding $129,000.00 to Dr. Campbell for breach of his employment contract is
 
 
 34
 AFFIRMED.
 
 
 
 [1]
 "Tail" insurance is malpractice occurrence insurance that provides coverage based on the date of the alleged malpractice, not the date the claim is filed. Southeast purchased this coverage to protect Dr. Campbell against potential malpractice claims filed following his termination, but occurring during his tenure at GSCH
 
 
 [2]
 That contract provides that the "[a]greement shall be governed by the laws of the District of Columbia." Accordingly, we look toward District of Columbia case law in interpreting the contract and the rights of the parties thereunder
 
 
 [3]
 Southeast relies heavily on Suburban Hospital, Inc. v. Dwiggins, 596 A.2d 1069 (Md.1991), to support its claim that the list of twelve bases for cause in the employment agreement should be viewed as illustrative and not exhaustive. However, Dwiggins is distinguishable from this case in several respects. First, and perhaps most importantly, there was no employment contract involved in Dwiggins; rather, the plaintiff (Dwiggins) was an at-will employee who was terminable with or without cause. Dwiggins, 596 A.2d at 1074. After certain disciplinary problems, Dwiggins was permitted to retain his job if he complied with five written "performance conditions." Id. The Maryland Court of Appeals held that those "performance conditions" did not destroy Dwiggins' status as an at-will employee and so did not constitute a contract containing the exclusive grounds for his dismissal, but rather constituted notice of "what he should be particularly careful about in light of his prior problems...." Id. In passing, the Dwiggins court noted: "Employee handbooks often list transgressions that can result in discipline. Unless there is evidence to the contrary, such lists should not be read as being exhaustive." Id. (emphasis added). Even if the bases for cause in this case appeared in an employee handbook, rather than in an employment contract, the language both preceding and following the twelve-item list here clearly indicates that the list should be read as being exhaustive. In other words, in this case there clearly is "evidence to the contrary. "
 
 
 [4]
 In fact, the majority of the thirteen cases involve oral employment contracts. In those cases involving written contracts, almost none of the contracts contain provisions for dismissal with cause; those which do, however, fail to define "cause." See, e.g., Telesphere Int'l, Inc. v. Scollin, 489 So.2d 1152, 1153 (Fla. Dist. Ct.App.), review denied, 500 So.2d 546 (Fla.1986)
 
 
 [5]
 There is some question whether Southeast properly raised its estoppel defense as a basis for its motions for judgment. For purposes of the appeal, we simply assume it did
 
 
 [6]
 Southeast also argues that this testimony was not relevant because Drs. Hambrick and Passamani observed Dr. Campbell's work performance at medical institutions other than GSCH. Although the pace and workload may have differed from GSCH, Dr. Campbell's performance in other medical venues was nonetheless relevant and, therefore, admissible to rebut Southeast's claim that he lacked discipline. Southeast was permitted to cross-examine Drs. Hambrick and Passamani, and so was able to bring to the jury's attention the fact that they did not work with or observe Dr. Campbell at GSCH. Accordingly, we cannot say that the district court abused its discretion in finding the evidence relevant. See Watson v. Lowcountry Red Cross, 974 F.2d 482, 489 (4th Cir.1992) ("On relevancy matters, the trial court has broad discretion")